FRIENDS OF HATTERAS ISLAND v. COASTAL RESOURCES COMM.

[117 N.C. App. 556 (1995)]

FRIENDS OF HATTERAS ISLAND NATIONAL HISTORIC MARITIME FOREST LAND TRUST FOR PRESERVATION, INC., PETITIONER v. COASTAL RESOURCES COMMISSION OF THE STATE OF NORTH CAROLINA AND CAPE HATTERAS WATER ASSOCIATION, INC., RESPONDENTS

No. 941SC289

(Filed 17 January 1995)

## 1. Environmental Protection, Regulation, and Conservation § 37 (NCI4th)— appeals under Coastal Reserve Statute—court having subject matter jurisdiction

Construing N.C.G.S. § 113A-123(a) together with N.C.G.S. § 150B-43, the Court of Appeals finds that the legislature intended to confer jurisdiction over appeals pursuant to N.C.G.S. § 113A-123(a) on the superior court of the county where the land or any part thereof is located as well as the Superior Court of Wake County or of the county where the petitioner resides; further, the legislature intended to establish the superior court of the county where the land or any part thereof is located as the proper venue for appeals pursuant to N.C.G.S. § 113A-123(a).

**Am Jur 2d, Administrative Law §§ 436, 437; Public Lands §§ 122-124.**

## 2. Administrative Law and Procedure § 65 (NCI4th)— standard of review of agency decision

If a petitioner argues that an agency's decision was based on an error of law, "de novo" review is required, but a reviewing court must apply the "whole record" test if the petitioner questions whether the agency's decision was supported by the evidence or whether the decision was arbitrary or capricious.

**Am Jur 2d, Administrative Law §§ 522, 585 et seq.**

## 3. Environmental Protection, Regulation, and Conservation § 39 (NCI4th)— drilling wells in maritime forest—no public use—drilling prohibited

The placement of nine wells, together with associated underground utilities and access roads, on state-owned lands in the Buxton Woods Reserve to provide drinking water for the residents of Hatteras Island was not a use in the nature of public trust rights and thus was prohibited by N.C.G.S. § 113A-129.2(e), since the purpose of the statute is to preserve, improve, and maintain undeveloped coastal land and water areas in an undeveloped and

natural state so that these areas can serve important public purposes, the primary ones being research and education.

**Am Jur 2d, Public Lands § 125.**

Appeal by respondents from order entered 28 October 1993 by Judge William C. Griffin, Jr. in Dare County Superior Court. Heard in the Court of Appeals 26 October 1994.

*Southern Environmental Law Center, by Derb S. Carter, Jr., J. David Farren and Lark Hayes, for petitioner-appellee.*

*Maupin Taylor Ellis & Adams, P.A., by Amos C. Dawson, III and Sean Callinicos; and Sharpe, Michael, Outten & Graham, by Robert L. Outten; for respondent-appellant Cape Hatteras Water Association.*

*Attorney General Michael F. Easley, by Assistant Attorney General Robin W. Smith, for respondent North Carolina Coastal Resources Commission.*

THOMPSON, Judge.

Respondents Cape Hatteras Water Association (CHWA) and North Carolina Coastal Resources Commission (CRC) appeal from an order entered by Judge William C. Griffin, Jr. on 28 October 1993 which revoked the issuance of a Coastal Area Management Act (CAMA) Major Development Permit No. 152-91 to CHWA.

The issue presented by this appeal is whether the trial court erred in reversing a permit which the CRC had granted to CHWA to place nine wells, together with associated underground utilities and access roads, on state-owned lands in the Buxton Woods Reserve. Buxton Woods, located on Cape Hatteras Island in Dare County, is the largest remaining maritime forest in North Carolina. In 1987 the State began a program of acquisition of lands in Buxton Woods. Shortly thereafter, in April 1988, CRC created a State Coastal Reserve program that encompasses the existing Estuary Sanctuary components (Zeke's Island, Rachel Carson, Currituck Banks and Masonboro Island) and also includes Bermuda Island and Buxton Woods. *See* 15A N.C. Admin. Code tit. 15A, r.070.0100-.0105 (April 1988).[1] In 1989, two

---

1. The North Carolina Coastal Reserve was created by amendment to the Estuarine Sanctuary Rules, N.C. Admin. Code tit. 15A, r.070.0100-.0105 (July 1986). The principal purposes of the North Carolina Coastal Reserve and its supporting programs are to:

FRIENDS OF HATTERAS ISLAND v. COASTAL RESOURCES COMM.

[117 N.C. App. 556 (1995)]

years after the State began its program of acquisition of Buxton Woods, the legislature established the North Carolina Coastal Reserve by the enactment of part V of the Coastal Area Management Act, N.C. Gen. Stat. § 113A-129.1 through .3 (1989) [Coastal Reserve Statute].[2] The legislature created the North Carolina Coastal Reserve System in recognition of the fact that the coastal area of North Carolina contains a number of important undeveloped natural areas and that "[i]mportant public purposes will be served by the preservation of certain of these areas in an undeveloped state." N.C. Gen. Stat. § 113A-129.1.[3] The system was created "for the purpose of acquiring,

---

(1) preserve coastal ecosystems . . . and to make them available for continuous future study of the processes, functions, and influences which shape and sustain the coastal ecosystems;

(2) provide new information on coastal ecosystem processes to decisionmakers as a basis for the promotion of sound management of coastal resources;

(3) provide a focal point for educational activities that increase the public awareness and understanding of coastal ecosystems, effects of man on them and the importance of the coastal systems to the State and the Nation;

(4) accommodate traditional recreational activities, commercial fishing, and other uses of the Reserve as long as they do not disturb the Reserve environment and are compatible with the research and educational activities taking place there.

N.C. Admin. Code tit. 15A, r.070.0101 (amended April 1988).

The Coastal Reserve Program of the Division of Coastal Management is responsible for managing and protecting the North Carolina Coastal Reserve; for promoting and coordinating research and educational programs at the components while allowing for compatible traditional uses; for maintaining a management plan for the Reserve; for maintaining cooperative agreements with scientific, educational, and resource management agencies and private citizens that will assist in the management of the reserve; and for providing new information on coastal processes to coastal management decisionmakers.

N.C. Admin. Code tit. 15A, r.070.0103 (amended April 1988).

2. "The Coastal Area Management Act (CAMA), N.C. Gen. Stat. § 113A-100, et. seq., was enacted to provide for the protection and continued productivity of the coastal resources, to manage competing uses of those resources, and to protect public trust rights in the lands and waters of the coastal area. CAMA directs and empowers the [CRC] to enforce the Act's provisions." Ballance v. N.C. Coastal Resources Comm., 108 N.C. App. 288, 423 S.E.2d 815, 816 (1992), disc. review denied, 333 N.C. 536, 429 S.E.2d 553 (1993), reconsideration dismissed, 333 N.C. 789, 431 S.E.2d 21 (1993).

3. The system is administered by the Department of Environment, Health, and Natural Resources, with the consultation and advice of the Coastal Resources Commission. N.C. Gen. Stat. § 113A-129.2(b).

improving, and maintaining undeveloped coastal land and water areas in a natural state." N.C. Gen. Stat. § 113A-129.2(a). N.C. Gen. Stat. § 113A-129.2(e) restricts the use of the Reserve primarily for research and education but also allows "[o]ther public uses, such as hunting, fishing, navigation and recreation . . . to the extent consistent with these primary uses."

Respondent CHWA is a private, nonprofit corporation which has since 1969 provided the only public water supply to residents of south Hatteras from a well field on a tract which extends 12,000 feet at the west end of Buxton Woods. A second tract is conterminous with the first tract and extends approximately 8,000 feet. A third tract extends approximately 6,200 feet along the National Park Service boundary. The second and third tracts have been identified as future well fields. The aquifer beneath these tracts serves as the sole source of drinking water for the surrounding communities of Avon, Buxton, Frisco and Hatteras, as well as the national seashore recreation area. In 1977, before the State acquired Buxton Woods, the CRC designated CHWA's existing and future well field areas as a "Public Water Supply Well Field Area of Environmental Concern" pursuant to N.C. Gen. Stat. § 113A-113(b), which authorizes the CRC to designate any one or more areas enumerated therein as areas of environmental concern. N.C. Gen. Stat. § 113A-113 (1994); N.C. Admin. Code tit. 07H, r.0406(c)(1) (September 1977) (regulation designating CHWA's well field areas as public water supply well fields). The CRC defines public water supply well fields as "areas of well-drained sands that extend downward from the surface into the shallow ground water table which supplies the public with potable water . . . [and which] are confined to a readily definable geographic area . . . ." N.C. Admin. Code tit. 15A, r.07H.0406(a) (September 1977). Development within a Public Water Supply Well Field AEC (1) must be consistent with the minimum standards set forth in N.C. Admin. Code tit. 15A, r.07H.0406(b) and (2) requires a permit from the Commission or its duly authorized agent pursuant to N.C. Gen. Stat. § 113A-118(a) (1994), which states that "every person before undertaking any development in any Area of Environmental Concern shall obtain . . . a permit pursuant to the provisions of [Part 4 of Article 7 of CAMA]."

In 1990, out of concern that the existing wellfield had been pumped at or near its capacity, CHWA sought to expand into future well field areas located in the Buxton Woods Coastal Reserve. Since this would entail the drilling of wells in the future well field areas of the Public Well Field AEC, CHWA had to apply to the Department of

Environment, Health, and Natural Resources, Division of Coastal Management [DCM], for the issuance of a Major Development Permit to drill wells in the future well field areas. *See* N.C. Gen. Stat. § 113A-118(d)(1). "Major development" is

> any development which requires permission, licensing, approval, certification or authorization in any form from the Environmental Management Commission, the Department of Environment, Health, and Natural Resources . . .; or which occupies a land or water area in excess of 20 acres; *or which contemplates drilling for or excavating natural resources on land* or under water; or which occupies on a single parcel a structure or structures in excess of a ground area of 60,000 square feet.

N.C. Gen. Stat. § 113A-118(d)(1) (emphasis added).[4]

CHWA's application, filed 30 November 1990, was submitted to nine state and federal agencies for review and comment. DCM Director Roger Schecter reviewed the application, comments, and information collected during evaluation of the application in light of N.C. Gen. Stat. § 113A-120(a)(1)-(10), which sets forth ten findings any one of which, if found by the responsible official or body, requires denial of the permit. In the absence of any such findings under section (a), N.C. Gen. Stat. § 113A-120(b) provides that the permit shall be granted.

DCM Director Schecter made a finding pursuant to N.C. Gen. Stat. § 113A-120(b) that the permit should be issued. Thereafter, CHWA was issued CAMA Major Development Permit no. 152-91 which contained 17 conditions to minimize impacts on maritime forest, wetlands vegetation, and swales. On 14 January 1992 the permit was amended to clarify the conditions in the original permit.

Thereafter, petitioner Friends of Hatteras Island National Historic Maritime Forest Land Trust for Preservation, Inc. (FOHI) filed a third party request for contested hearing on the issuance of the original and amended permits pursuant to N.C. Gen. Stat. § 113A-121.1(b). FOHI is a conservation organization based on Hatteras Island whose stated purpose is to promote responsible choices in the use of the island's natural resources.

---

4. If the contemplated development constitutes "minor development," the permit shall be obtained from the appropriate city or county under an expedited procedure. N.C. Gen. Stat. § 113A-118(b). "Minor development" is defined as "any development other than 'major development.' " N.C. Gen. Stat. § 113A-118(d)(2).

**FRIENDS OF HATTERAS ISLAND v. COASTAL RESOURCES COMM.**

[117 N.C. App. 556 (1995)]

In its request for a contested case hearing petitioner alleged, among other things, that the permit decision was inconsistent with the Coastal Reserve Statute, N.C. Gen. Stat. § 113A-129.1-.3, and with the rules adopted by the Department of Environment, Health, and Natural Resources pursuant thereto. By order entered 18 February 1992, T. Erie Haste, Jr., Vice Chairman of the CRC, granted petitioner's request for a contested case hearing on this issue.

Administrative Law Judge Thomas R. West conducted the administrative hearing beginning on 10 August 1992 and concluding on 1 September 1992. Judge West issued a decision recommending issuance of the CAMA permit with minor modifications. The CRC made a final decision in the contested case on 20 November 1992 based on consideration of the hearing record, Judge West's Recommended Decision, and oral arguments by the parties. The CRC's final order issuing the permit was entered on 9 December 1992.

The CRC considered the following issues:

(1) Whether CAMA Permit No. 152-91, which allows construction by the CHWA of nine wells for the production of water, together with the pertinent access and underground utilities, in a portion of the Cape Hatteras Well Field AEC within the Buxton Woods Coastal Reserve is consistent with N.C.G.S. 113A-120 and the applicable state guidelines as applied through N.C. Gen. Stat. § 113A-120(a)(8).

(2) Whether considering the engineering requirements and all economic costs, there is a practicable alternative that would accomplish the overall program purposes with less adverse impact on the public resources (thus requiring denial of the permit under N.C. Gen. Stat. § 113A-120(a)(9)).

(3) Whether the development allowed by Permit No. 152-91 would contribute to cumulative effects which would be inconsistent with applicable CAMA guidelines (thus requiring denial of the permit under N.C. Gen. Stat. § 113A-120(a)(10)).[5]

---

5. N.C. Gen. Stat. § 113A-120(a)(8),(9) and (10) provide:

(a) The responsible official or body shall deny an application for permit upon finding:

* * *

(8) In any case, that the development is inconsistent with the State guidelines or · the local land-use plans.

(9) In any case, that considering engineering requirements and all economic costs there is a practicable alternative that would accomplish the overall project purposes with less adverse impact on the public resources.

In affirming the issuance of the permit, the CRC made the following conclusions of law:

3. Withdrawal of water from the aquifer underlying the Buxton Woods Coastal Reserve . . . is a traditional use consistent with preservation of the area in an undeveloped state and consistent with the coastal reserve's primary use as a site for research and education. The improvements and alterations allowed by the Permit are consistent with these uses.

4. Withdrawal of water from the aquifer underlying the Buxton Woods Coastal Reserve by the [CHWA] . . . is a public use consistent with preservation of the area in an undeveloped state and consistent with the coastal reserve's primary use as a site for research and education, particularly as no other source of public drinking water exists in this area.

5. Withdrawal of water from the aquifer underlying the Buxton Woods Coastal Reserve by the [CHWA], as permitted and with the performance standard made applicable to Well No. 3, maintains the Coastal Reserve's essential natural character.

6. Disturbance or removal of vegetation as permitted is de minimis and as such is not proscribed by 15A NCAC 70.0202(6). The Commission further finds, alternatively, that the ALJ correctly concluded that 15A NCAC 70.0202(6) is written in such terms that the rule is inconsistent with N.C.G.S. 113A-129.1(b) and 113A-129.2(e) and thus is void as applied in this case because it is not within the statutory authority of the agency and is not reasonably necessary to enable the agency to fulfill a duty delegated to it by the General Assembly.

* * *

8. Considering the engineering requirements and all economic costs, there is no practicable alternative that would accomplish the overall project purposes with less adverse impact on the public resources and thus there is no basis for finding that the proposed development is inconsistent with N.C.G.S. 113A-120(a)(9).

* * *

(10) In any case, that the proposed development would contribute to cumulative effects that would be inconsistent with the guidelines set forth in subdivisions (1) through (9) of this subsection. Cumulative effects are impacts attributable to the collective effects of a number of projects . . . .

10. As permitted pursuant to this order, the propoposed wells and associated utilities and access roads or trails, will not contribute to cumulative effects that would be inconsistent with N.C.G.S. 113A-120(a)1-9, the State guidelines or the local land use plans and thus there is no basis for finding that the proposed development was inconsistent with N.C.G.S. 113A-120(a)(10). . . .

The CRC then decreed, in view of its findings of fact and conclusions of law, that the permit should be modified and that Permit No. 152-91, as modified, "is consistent in all respects with all applicable state guidelines, statutes and rules, including those governing the coastal reserves and shall be granted."

On 19 January 1993, FOHI filed a petition for judicial review in Wake County Superior Court. Petitioner excepted to the above conclusions of the CRC as erroneous and alleged that the CRC's decision was affected by error of law, not supported by substantial evidence, and arbitrary and capricious within the meaning of N.C. Gen. Stat. § 150B-51(b)(4),(5) and (6) (1991). Respondents CRC and CHWA moved to dismiss the petition for lack of subject matter jurisdiction. By order entered 29 April 1993, Judge Narley Cashwell denied respondents' motion to dismiss and ordered the action removed to Dare County.

Judge William C. Griffin, Jr. conducted a hearing on judicial review of the final CRC decision at the 13 September 1993 civil session of Dare County Superior Court. On 28 October 1993, Judge Griffin entered an order overruling the CRC's final decision and revoking the CAMA permit. Judge Griffin concluded, among other things, that "by enactment of N.C.G.S. 113A-129.1, *et. seq.*, the legislature pre-empted the Commission's authority to permit uses of the components of the Coastal Reserve System, except those specifically permitted by that statute," and essentially concluded that the CRC erred as a matter of law in the issuance of the permit because the statute did not permit the activities permitted by CAMA Permit No. 152-91.

I. Respondents' Motion to Dismiss for
Lack of Subject Matter Jurisdiction

[1] The superior court concluded that "the [c]ourt has jurisdiction of the subject matter and the parties pursuant to N.C.G.S. 113A-121.1(b) and 150[B]-43" and that "[p]etitioner has exhausted all available administrative remedies and has no other adequate procedure for

judicial review. Accordingly, petitioners are entitled to the full scope of judicial review provided by N.C.G.S. 150B-43 of the APA." Respondents assign error to the denial of their motion to dismiss the petition for lack of subject matter jurisdiction and to the above conclusions of law. Respondents argue that: (1) Wake County Superior Court lacked subject matter jurisdiction over petitioner's appeal and thus its order removing the case to Dare County Superior Court is null and void, (2) the Dare County Superior Court judgment is null and void for lack of subject matter jurisdiction because a court without jurisdiction cannot confer jurisdiction upon another court by transfer and (3) the Dare County Superior Court lacked jurisdiction over the subject matter and the parties because petitioner failed to file its petition for judicial review in Dare County Superior Court pursuant to N.C. Gen. Stat. § 113A-123(a) (1994). We hold that Wake County Superior Court had subject matter jurisdiction and thus affirm the denial of respondents' motion to dismiss.

Respondents' arguments are premised on their interpretation of N.C. Gen. Stat. § 113A-123(a) of CAMA and N.C. Gen. Stat. § 150B-43 of the Adminstrative Procedure Act (APA). N.C. Gen. Stat. § 113A-123(a) (1994) governs the procedure for judicial review of final decisions or orders of the Commission under Part 4 of CAMA, which consists of N.C. Gen. Stat. § 113A-116 through -128. N.C. Gen. Stat. § 113A-123(a) provides that:

> Any person directly affected by any final decision or order of the Commission under this Part *may* appeal such decision or order to the superior court of the county where the land or any part thereof is located, *pursuant to the provisions of Chapter 150B of the General Statutes.*

(emphasis added).

N.C. Gen. Stat. § 150B-43 (1991) of the APA provides, in pertinent part:

> Any person who is aggrieved by the final decision in a contested case, and who has exhausted all administrative remedies made available to him by statute or agency rule, is entitled to judicial review of the decision under this Article, unless adequate procedure for judicial review is provided by another statute, in which case the review shall be under such other statute.

N.C. Gen. Stat. § 150B-45 (1991) provides that the person seeking judicial review of a final decision "must file a petition in the Superior

Court of Wake County or in the superior court of the county where the petitioner resides . . . within thirty days after the person is served with a written copy of the decision." Failure to file a petition within the required time waives the right to judicial review under Article 4 of the APA. N.C. Gen. Stat. § 150B-45. Moreover, failure to file in Wake County or in the county in which petitioner resides within 30 days of service of the CRC decision requires dismissal for lack of subject matter jurisdiction. *See Gummels v. N.C. Dept. of Human Resources,* 97 N.C. App. 245, 252, 388 S.E.2d 223, 227, *disc. review denied,* 326 N.C. 596, 393 S.E.2d 877 (1990).

Respondents contend that N.C. Gen. Stat. § 113A-123 provides adequate procedure for judicial review and thus judicial review is not available under the APA but only under N.C. Gen. Stat. § 113A-123. They further contend that since N.C. Gen. Stat. § 113A-123(a) provides adequate procedure for judicial review, that section of the statute is jurisdictional and confers subject matter jurisdiction over claims of this kind *solely* on the superior court of the county where the land or any part of the land is located, which in this case is Dare County.

Respondents' argument that N.C. Gen. Stat. § 113A-123(a) provides adequate procedure for judicial review is without merit. Adequate procedure for judicial review would exist under N.C. Gen. Stat. § 113A-123(a) only if the scope of review provided therein were at least equal to that provided by Article 4 of Chapter 150B. *See Commissioner of Insurance v. Rate Bureau,* 300 N.C. 381, 395, 269 S.E.2d 547, 559, *rehearing denied,* 301 N.C. 107, 273 S.E.2d 300 (1980) (adequate procedure for judicial review exists under N.C. Gen. Stat. § 58-9.6(b), which provides for judicial review of ratemaking cases, if the scope of review under that statute is equal to that under Article 4 of G.S. Chapter 150A, which has since been recodified as Chapter 150B). The scope of review provided by Article 4 of Chapter 150B is set forth in N.C. Gen. Stat. § 150B-51, entitled "Scope of Review." Section 150B-51 requires initial determinations in the review of certain cases and further provides that the court reviewing a final decision may:

affirm the decision . . . or remand the case or further proceedings [and] may also reverse or modify the agency's decision if the substantial rights of the petitioners may have been prejudiced because the agency's findings, inferences, conclusions, or decisions are:

(1) In violation of constitutional provisions;

(2) In excess of the statutory authority or jurisdiction of the agency;

(3) Made upon unlawful procedure;

(4) Affected by other error of law;

(5) Unsupported by substantial evidence admissable under G.S. 150B- 29(a), 150B-30, or 150B-31 in view of the entire record as submitted;

(6) Arbitrary or capricious.

N.C. Gen. Stat. § 150B-51 (1991). This is not even a close question; N.C. Gen. Stat. § 113A-123 does not set forth the scope of review but instead provides that judicial review is available pursuant to the provisions of Chapter 150B of the APA.

"[S]tatutes which are *in pari materia, i.e.*, which relate to or are applicable to the same matter or subject, although enacted at different times must be construed together in order to ascertain legislative intent." *Carver v. Carver*, 310 N.C. 669, 674, 314 S.E.2d 739, 742 (1984). Construing N.C. Gen. Stat. § 113A-123(a) together with N.C. Gen. Stat. § 150B-43, we find that the legislature intended to confer jurisdiction over appeals pursuant to N.C. Gen. Stat. § 113A-123(a) on the superior court of the county where the land or any part thereof is located as well as on the Superior Court of Wake County or of the county where the petitioner resides. We further find that the legislature intended to establish the superior court of the county where the land or any part thereof is located as the proper *venue* for appeals pursuant to N.C. Gen. Stat. § 113A-123(a). Thus, Wake County had subject matter jurisdiction over petitioner's appeal and properly transferred the appeal to Dare County.

## II. STANDARD OF REVIEW

**[2]** Our review of a superior court's decision pursuant to N.C. Gen. Stat. § 150B-52 " 'is the same as in any other civil case—consideration of whether the court committed any error of law.' " *Amanini v. N.C. Dept. of Human Resources*, 114 N.C. App. 668, 675-76, 443 S.E.2d 114, 118-19 (1994) (*citing In re Appeal by McCrary*, 112 N.C. App. 161, 165, 435 S.E.2d 359, 363 (1993)). In reviewing the superior court's order for error of law, this Court first determines whether the trial court exercised the appropriate scope of review and, if appropriate,

determines whether the trial court properly did so. *Id.* at 675, 443 S.E.2d at 118-19.

The standard of review to be employed in review of an agency decision depends upon the nature of the alleged error. *Walker v. N.C. Dept. of Human Resources*, 100 N.C. App. 498, 502, 397 S.E.2d 350, 354 (1990), *disc. review denied*, 328 N.C. 98, 402 S.E.2d 430 (1991). If the petitioner argues that the agency's decision was based on an error of law, "*de novo*" review is required. " '*De novo*' review requires a court to consider a question anew, as if not considered or decided by the agency." *Amanini*, 114 N.C. App. at 674, 443 S.E.2d at 118. The court may "freely substitute its own judgment for that of the agency." *Brooks, Commissioner of Labor v. Grading Co.*, 303 N.C. 573, 580-81, 281 S.E.2d 24, 29 (1981). Since incorrect statutory interpretation by an agency constitutes an error of law under N.C. Gen. Stat. § 150B-51(b)(4), when the issue on appeal is whether the state agency erred in interpreting a statutory term, " 'an appellate court may substitute its own judgment [for that of the agency] and employ *de novo* review.' " *Amanini*, 114 N.C. App. at 678, 443 S.E.2d at 120.

" 'If, however, the petitioner questions (1) whether the agency's decision was supported by the evidence or (2) whether the decision was arbitrary or capricious, then the reviewing court must apply the "whole record" test.' " *Armanini*, 114 N.C. App. at 674, 443 S.E.2d at 118 (citation omitted). "The 'whole record' test requires the reviewing court to examine all competent evidence in order to determine whether the agency decision is supported by 'substantial evidence.' " *Id.* (citation omitted).

Where, as in the case *sub judice*, petitioner challenges the agency's decision as (1) affected by errors of law, (2) contrary to the evidence, and (3) arbitrary and capricious, the superior court may even utilize more than one standard of review. *See In Re Appeal by McCrary*, 112 N.C. App. 161, 165, 435 S.E.2d 359, 363 (1993).

Judge Griffin made the following conclusions, to which respondents assign error:

4. By enactment of N.C.G.S. 113A-129.1, *et. eq.*, the legislature pre-empted the Commission's authority to permit uses of the components of the Coastal Reserve System, except those specifically permitted by that statute.

5. To the extent the Commission relied on pronouncements made by politicians during the acquisition process about the uses to

which the acquisitions would be put,. the Commission was in error as a matter of law.

6. Although the statute permits limited traditional public uses such as hunting, fishing, navigation and recreation, it specifically requires components of the Coastal Reserve System, including Buxton Woods to be preserved in an undeveloped state. The activities permitted by CAMA Permit No. 152-91 are not public uses within this meaning of the statute.

7. The Commission's conclusion that the authorized development is a public use consistent with the Coastal Reserve's primary uses of research and education within the meaning of the statute is error as a matter of law.

8. The Commission's conclusion that the activities permitted [sic] Permit No. 152-91 are consistent with preservation of the area in an undeveloped state is error as a matter of law.

9. The Commission erred as a matter of law in utilizing a de minimis analysis in applying the regulations of [DEHNR] prohibiting the removal or disturbance of vegetation within a Coastal Reserve.

10. The Commission erred as a matter of law in concluding that the regulation prohibiting removal or disturbance of vegetation was void under the facts of this case.

11. The Commission erred as a matter of law in considering whether or not a practicable alternative exists. .

* * *

13. The [CRC] erred as a matter of law in the issuance of CAMA Permit No. 152-91.

### III. MEANING OF PUBLIC USE AS USED IN N.C GEN. STAT. § 113A-129.2(e)

[3]  We first address the assignments of error relating to the court's conclusions 4 through 8 and number 13. With respect to those conclusions, respondents argue: (1) that the court erred in concluding that uses of the Coastal Reserve authorized by CAMA Permit No. 152-91 are not allowed by the Coastal Reserve Statute and thus the court erred in concluding that the CRC's authority to permit such uses of the components of the Coastal Reserve System is pre-empted by the Coastal Reserve Statute, (2) the CRC did not err in its reliance

on pronouncements made by politicians since the CRC was entitled to consider competent evidence in the Record regarding the history of the legislation and the circumstances surrounding its adoption, and (3) the CRC correctly concluded that the authorized development is a public use consistent with the Coastal Reserve's primary uses of research and education and with the statute's requirement that the area be preserved in an undeveloped state.

The primary issue raised by these assignments of error is whether the activity permitted by the CAMA Major Development Permit No. 152-91 is a "public use" within the meaning of N.C. Gen. Stat. § 113A-129.2(e) of the Coastal Reserve Statute.

N.C. Gen. Stat. § 113A-129.2(e) (1994) provides that:

> All lands and waters within the system shall be used primarily for research and education. *Other public uses, such as hunting, fishing, navigation and recreation, shall be allowed to the extent consistent with these primary uses.* Improvements and alterations to the lands shall be limited to those consistent with these uses.

(emphasis added).

Respondents argue that "other public uses" encompasses a broad range of uses which include the provision of water services to the residents of Cape Hatteras. On the other hand, petitioner argues that "other public uses" means uses in the nature of public trust rights, such as those enumerated in N.C. Gen. Stat. §§ 113A-129.1(a) and 113A-129.2(e). Petitioner further argues that the placement of nine wells, together with associated underground utilities and access roads, is not a use in the nature of public trust rights and is thus prohibited by N.C. Gen. Stat. § 113A-129.2(e). We agree with the petitioner.

In enacting the Coastal Reserve Statute, the legislature determined and declared by way of legislative finding that:

> [T]he coastal area of North Carolina contains a number of important undeveloped natural areas . . . [which] *are vital to* continued fishery and wildlife protection, water quality maintenance and improvement, preservation of unique and important coastal natural areas, aesthetic enjoyment, and *public trust rights such as hunting, fishing, navigation, and recreation.* Such land and water areas are necessary for the preservation of estuarine areas

of the State, constitute important research facilities, and provide public access to waters of the State.

N.C. Gen. Stat. § 113A-129.1(a) (1994) (emphasis added). N.C. Gen. Stat. § 113A-129.1(b) provides:

Important public purposes will be served by the preservation of certain of these areas in an undeveloped state. Such areas would thereafter be available for research, education, and other consistent public uses. These areas would also continue to contribute perpetually to the natural productivity and biological, economic, and aesthetic values of North Carolina's coastal area.

N.C. Gen. Stat. § 113A-129.2(a) proclaims that "[t]here is hereby created a North Carolina Coastal Reserve System for the purpose of acquiring, improving, and maintaining undeveloped coastal land and water areas in a natural state."

Thus, the purpose of the statute, as gleaned from N.C. Gen. Stat. §§ 113A-129.1 and 113A-129.2(a), is to preserve, improve, and maintain undeveloped coastal land and water areas in an undeveloped and natural state so that these areas can serve important public purposes. The primary public purpose or use served by the preservation of these areas in an undeveloped state is research and education. "Other public uses, such as hunting, fishing, navigation and recreation, shall be allowed to the extent consistent with these primary uses." N.C. Gen. Stat. § 113A-129.2(e).

The importance of the statute's purpose is emphasized by the association of the words "preservation," "improving" and "maintaining," which are more or less similarly defined, with the words "undeveloped" and "natural." The word "preservation," is defined as "[k]eeping safe from harm; avoiding injury, destruction, or decay; maintenance; . . . not creation, but the saving of that which already exists, and implies the continuance of what previously existed." *Black's Law Dictionary* 1066 (5th ed. 1979). "Improve" means "[t]o meliorate, make better, to increase the value or good qualities of, mend, repair. . . ." *Black's Law Dictionary* 682 (5th ed. 1979). The term "maintain," "is variously defined as acts of repairs and other acts to prevent a decline, lapse or cessation from existing state or condition; bear the expense of; carry on; commence; continue; furnish means for subsistence or existence of; hold; hold or keep in an existing state or condition; . . . keep up; preserve; preserve from lapse,

decline, failure, or cessation. . . ." *Black's Law Dictionary* 859 (5th ed. 1979).

In support of its argument, respondents point to the broad interpetation of the phrases "public use" and "public purpose" under tax law and the law of eminent domain. Our Supreme Court has found that " '[f]or the most part the term "public purpose" is employed in the same sense in the law of taxation and in the law of eminent domain.' " *Mitchell v. Financing Authority*, 273 N.C. 137, 158, 159 S.E.2d 745, 760 (1968) (citation omitted). *Black's Law Dictionary* defines "public purpose in the law of taxation, eminent domain, etc." as:

> a term of classification to distinguish the objects for which, according to settled usage, the government is to provide, from those which, by the like usage, are left to private interest, inclination, or liberality. The constitutional requirement that the purpose of any tax . . . or particular exertion of the power of eminent domain, shall be the convenience, safety, or welfare of the entire community and not the welfare of a specific individual or class of persons.

*Black's Law Dictionary* 1107 (5th ed. 1979).

Under the law of eminent domain, "public use" has been broadly interpreted to allow government to take property for a variety of uses for which a benefit accrues to the public in common. *See City of Charlotte v. Heath*, 226 N.C. 750, 755-56, 40 S.E.2d 600, 605 (1946). Proper uses of eminent domain include power substations, microwave towers, public sewerage systems, public water supplies and pipelines for the transportation of various materials. N.C. Gen. Stat. § 40A-3(a)(1) (1984). "Public purpose" for taxation is similarly broad.[6]

In further support of its argument that "public use" should be broadly interpreted, respondents point to (1) certain facts and cir-

___

6. In arguing that the permitted activities fall within the meanings of "public use" and "public purpose" as interpreted in the law of eminent domain and tax law, respondents note that pursuant to N.C. Gen. Stat. § 130A-311, *et. seq.*, CHWA is defined and regulated as both a "public water system" and a "community water system." "Public water system" is defined as "a system for the provision to the public of piped water for human consumption if the system serves 15 or more service connections or which regularly serves 25 or more individuals." N.C. Gen. Stat. § 130A-313(10) (1992). Respondents further note that pursuant to N.C. Gen. Stat. §§ 153A-275 and 160A-312, respectively, counties and cities are given authority to operate and contract for the operation of public enterprises, which are defined to include "water supply and distribution systems."

cumstances regarding the State's purchase of Buxton Woods in 1987, (2) specific language of the statute, and (3) the highly limited application of "public trust rights."

The CRC in its findings of fact recites the following facts and circumstances regarding the purchase of Buxton Woods: (1) Governor Martin's 23 October 1987 press release which announced that the State would begin purchasing key portions of Buxton Woods for use as a natural area noted that protection of the community water supply was one of the goals of the acquisition program and that "[a]greements may also be reached that would allow portions of the acquired area to be used for community water supply," (2) the Environmental Assessment prepared for the purchase of Buxton Woods states under "Project Purposes" that "[f]uture uses of small portions of the area as well sites for a community water supply system is also possible," (3) the National Heritage Program of the Division of Parks and Recreation recognized that portions of Buxton Woods contemplated for acquisition might be used for future well sites, (4) when the State purchased the Foreman-Blades tract of Buxton Woods in January 1988, it did so with the express understanding that future water supply wells *might* be located on that property and that fact was incorporated into the Council of State's approval of the purchase, and (5) State officials involved in the acquisition of lands in Buxton Woods contemplated that portions of those lands could be used as well sites for the public water supply system, if the wells could be installed in an environmentally compatible manner.

The CRC further found that:

During the State's acquisition of the lands currently in the Buxton Woods Coastal Reserve, it was made clear that future use of small portions of the state-owned property for wells for the public water supply system was contemplated as a possible future use. The state has continued to acquire and is currently attempting to acquire additional lands for the Buxton Woods Coastal Reserve. The State's contemplated acquisitions are intended to eventually include virtually all of the lands designated as the "future well field" in the Public Water Supply Well Field AEC. If the Water Association is to have access to the "future well field" for well sites, such access will necessarily have to be on State-owned lands.

Respondents contend that public trust rights, which refer to the public's right in land flowed by navigable waters, have no application to

lands such as Buxton Woods which are neither submerged nor imme-diately adjacent to navigable waters. Therefore, they argue, the legis-lature could not have intended to restrict "public uses" to uses in the nature of public trust rights. Respondents also argue that the follow-ing language in N.C. Gen. Stat. § 113A-129.1 reflects an intent to allow the permitted activity: "These areas are vital to . . . water quality main-tenance and improvement . . . and provide public access to waters of the State."

"The primary function of a court in construing legislation is to insure that the purpose of the legislature in enacting it . . . is accom-plished. The best indicia of that legislative purpose are 'the language of the statute, the spirit of the act, and what the act seeks to accom-plish.' " *Comr. of Insurance v. Automobile Rate Office*, 293 N.C. 365, 392, 239 S.E.2d 48, 65 (1977) (citation omitted). We may also consid-er the circumstances surrounding a statute's adoption which throw light upon the evil sought to be remedied. *Id.* In fact, where language of a statute is ambiguous, courts may consider all facts and circum-stances existing at the time of and leading up to the enactment of the statute. *Hyde Co. Board of Education v. Mann*, 250 N.C. 493, 498, 109 S.E.2d 175, 178-79 (1959).

"Courts should always construe provisions of a statute in a man-ner which will tend to prevent it from being circumvented." *Campbell v. Church*, 298 N.C. 476, 484, 259 S.E.2d 558, 564 (1979), *on remand*, 51 N.C. App. 393, 276 S.E.2d 712 (1981). "Words of a statute may not be interpreted out of context, but individual expressions must be con-strued as a part of the composite whole and must be accorded only that meaning which other modifying provisions and the clear intent and purpose of the act will permit." *In re Hardy*, 294 N.C. 90, 95-96, 240 S.E.2d 367, 371-72 (1978). "When a statute on its face reveals leg-islative intent and purpose, its terms are to be given meaning consist-ent with that intent and purpose." *Turlington v. McLeod*, 323 N.C. 591, 597, 374 S.E.2d 394, 399 (1988). Thus, our construction of the term "public use" is controlled by the intent and purpose of the legis-lature, as expressly stated in the Coastal Reserve Statute.

We cannot interpret the term "public use" under the Coastal Reserve Statute in the broad manner suggested by respondents, for to do so would be to interpret the term out of context and would frus-trate the purpose of the statute by allowing the reserves to be opened to a wide range of projects which may permit development of the area and alter its natural state. The enumerated examples of other public

uses in N.C. Gen. Stat. § 113A-129.2(e) and the clear intent and purpose of the statute lead us to conclude that the legislature did not intend the term "public use" to be employed in the same broad sense as the terms "public purpose" and "public use" are employed in tax law and the law of eminent domain. If the legislature had intended "public use" to encompass activities designed for the convenience, safety, or welfare of the entire community, as the term is employed in tax law and the law of eminent domain, it would not have listed hunting, fishing, navigation and recreation as specific examples of other "public uses." The word "such," which precedes "hunting, fishing, navigation and recreation" means "[o]f that kind, having particular quality or character specified[;] [i]dentical with, being the same as what has been mentioned[;] [a]like,. similar, of the like kind." *Black's Law Dictionary* 1284 (5th ed. 1979). As codified in N.C. Gen. Stat. § 1-45.1 (1994), public trust rights are

> those rights held in trust by the State for the use and benefit of the people of the State in common . . . . They include, but are not limited to, the right to *navigate*, swim, *hunt, fish* and enjoy all *recreational activities* in the watercourses of the State and the right to freely use and enjoy the State's ocean and estuarine beaches and public access to the beaches.

(emphasis added) (providing that title to real property held by the State and subject to public trust rights may not be acquired by adverse possession).

The legislature recognized these rights in its legislative finding that the undeveloped natural areas on the North Carolina coast are "vital to . . . public trust rights such as hunting, fishing, navigation and recreation." N.C. Gen. Stat. § 113A-129.1(a).

The reference to those public trust rights as "other public uses" in N.C. Gen. Stat. § 113A-129.2(e) does not affect our interpretation. The term "public use" encompasses the primary uses of "research and education" and more specific uses in the nature of public trust rights. We conclude that the use of this term reflects the legislature's intent to restrict use of the Coastal Reserve primarily to "research and education" and secondarily to uses in the nature of public trust rights to the extent consistent with research and education.

Our interpretation of the statute is also unaffected by the fact that officials involved in the purchase of Buxton Woods contemplated the use of the area for public water supply. The legislature enacted the

Coastal Reserve Statute two years after the State's acquisition of Buxton Woods in order to develop a system for the preservation, maintenance, and improvement of the six areas within the Coastal Reserve program which the CRC had created in 1987 and of any areas which might be placed within the Reserve within the future. Respondents note that, whereas Buxton Woods is an upland area which has been significantly impacted by Hatteras Island's residents over a long period of time, the other five sites in the reserve system are relatively undisturbed estuarine areas. We cannot construe the statute, which applies to the present six Reserve areas and any future Reserve areas, as allowing the permitted activities simply because of circumstances unique to that one area of the Reserve. Any such interpretation would frustrate the clear intent of the statute. Moreover, assuming *arguendo* that the legislature was aware that officials involved in the purchase of Buxton Woods contemplated its possible use as a source of public water supply when it enacted the statute, its failure to make express provision for such use reflects an intent to subject the Buxton Woods area to the same use restrictions that apply to its relatively undisturbed counterparts. To the extent the CRC relied on such facts and circumstances regarding the purchase of Buxton Woods, its reliance was misplaced.

Our interpretation of the term "public use," adheres to the purpose of preserving, improving and maintaining the undeveloped coastal land and water areas in an undeveloped and natural state for important public purposes. *See* N.C. Gen. Stat. §§ 113A-129.1(b), 113A-129.2(a). Like research and education, hunting, fishing, navigation, and recreation are activities which preserve the land in an undeveloped and natural state. Hunting, fishing, navigation and recreation require only a temporary presence on the Reserve and do not necessitate alteration of the Reserve's undeveloped and natural state. They are recreational activities enjoyed by individuals. None require the placement of any structure on the Reserve. Thus, the impact of these activities on the natural resources of the area is minimal.

The nature and intensity of the activity contemplated by the CRC permit differ drastically from uses in the nature of public trust rights. To enable the CHWA to sell water to the surrounding communities, the permitted activities would require ground disturbance for the permanent installation of underground water and electrical lines and the clearing of trees to prepare the way for an access road. Unlike hunting, fishing, navigation and recreation, the permitted activities require the imposition of seventeen conditions to minimize the impact on

wetland vegetation and swales. These conditions require the placement of "monitoring wells" (in addition to "production wells") which must be continuously monitored. A synopsis of certain of the permit's conditions illustrates the magnitude of the difference between the permitted activities and those uses that are in the nature of public trust rights:

Condition 9 imposes a performance standard to regulate lowering or drawdown of the water table in the surficial or water table aquifer at each pumping well in order to protect wetland vegetation and swales. If the standard is exceeded for more than a 48 hour period, pumping must be restricted for a period sufficient to allow recovery of the water table and compliance with the performance standard.

Condition 10 requires the placement of six monitoring wells at production wells 5 and 6 for continuous monitoring over a two year period, after which time monitoring requirements and the performance standard will be reviewed and may be revised based on an assessment of the impact of withdrawals on the wetland vegetation and swales.

Condition 11 requires continuous monitoring of production wells 4, 7, 8 and 9 in the event monitoring at production wells 5 and 6 shows significant contravention of the performance standard.

Condition 12 requires the construction of a continuously monitored control well in the water table aquifer 25 feet from Buxton Woods Test Well No. 4 to measure background or ambient water table elevations.

Condition 13 requires the placement and continuous monitoring of a staging station to measure surface water elevations in wetlands at a location approved by DCM in close proximity to the wellfield at the deepest known location where standing water can be expected for most of the year in order to directly assess the impact of wellfield withdrawals on surface water elevations in the wetlands. It also requires preparation of a one-foot contour map of the wellfield to determine wetland impacts resulting from a lowering of wetland surface water.

Condition 14 requires the installation of a continuous recording rain gauge near production well 6 in order to differentiate

**FRIENDS OF HATTERAS ISLAND v. COASTAL RESOURCES COMM.**

[117 N.C. App. 556 (1995)]

water table declines due to pumping from naturally occurring declines due to drought.

\* \* \*

Condition 16 requires at least six months of monitoring data to be collected before the wellfield becomes operational.

By contrast, hunting, fishing, navigation and recreation have an insignificant impact and pose so little threat to the undeveloped and natural state of the Reserve that no complex monitoring scheme is required.

Respondents argue that the CRC properly concluded, based on its findings of fact regarding the insignificant impact of the permitted activities on the Reserve environment, that the permitted activities are consistent with the preservation of the area in an undeveloped state and with the primary uses of research and education. We disagree. In fact, the CRC's findings support our characterization of the permitted activities. The CRC's findings acknowledge that the permitted activities will require the cutting of a few large trees, the placement of access roads at a maximum of 15 feet wide, and the installation of underground water and electrical lines.[7] The CRC's findings also acknowledge that the permitted activities will have an impact, albeit an "insignificant" one, on the aquifer underlying Buxton Woods, the maritime forest, and wetlands.[8]

---

7. The CRC found:

Only a few large growth trees, perhaps as few as three, will need to be cut to provide access to the permitted well sites. In addition, it is anticipated that grading will not be necessary. The access roads can only be 15 feet wide and it is anticipated that they will only be approximately 8 feet wide. . . . DCM staff will mark the final well sites and access alignments to insure that disturbance is minimal. The forest canopy will not be significantly disturbed and there will be no salt spray damage. . . . Short-term impacts from the installation of the underground water and electrical lines will be minimal. . . .

8. In this regard, the CRC found:

31. By the end of 1991, enough data existed to support the conclusion that the proposed wells would not have a significant impact on the aquifer. . . . Therefore, the permitted wells are expected to have even less impact on wetlands than the existing wells.

\* \* \*

42. The disturbance of the Buxton Woods Coastal Reserve by the project as permitted will be *de minimis*. Only about one-third of one percent of the upland forested area will be impacted by the permitted activities. Only about 0.74 acres

**FRIENDS OF HATTERAS ISLAND v. COASTAL RESOURCES COMM.**

[117 N.C. App. 556 (1995)]

Respondents' broad interpretation is not only in conflict with the clear purpose of the statute but is also in conflict with the CRC's Coastal Reserve regulations (adopted before the legislature's enactment of the Coastal Reserve Statute). The Reserve regulations impose use requirements on the Reserve which do not mention "public uses" ·but merely refer to "traditional recreational uses" and state that such uses "shall be allowed to continue as long as the activities do not disrupt the natural integrity of the Reserve or any research or educational projects." N.C. Admin. Code tit. 15A, r.070.0202(2) (July 1986). Moreover, the use requirements provide that "[u]sers of the Reserve shall not disturb or remove any live animals, except those allowed by state hunting and fishing rules as they apply to the Reserve, or vegetation within the Reserve unless such action is part of a research or educational project approved by the management agency" and prohibit "other acts or uses which are detrimental to the maintenance of the property in its natural condition . . . including, but not limited to, disturbances of the soil, mining, commercial or industrial uses, timber harvesting, ditching and draining, deposition of waste materials." N.C. Admin. Code tit. 15A, r.070.0202(6),(9). Contrary to the contention of the respondents, we read the regulations as consistent with the language and spirit of the Coastal Reserve Statute.

In conclusion, we find that the legislature intended to limit "other public uses" of the Reserve to uses in the nature of public trust rights in order to preserve the Reserve in an undeveloped and natural state and that the permitted activities do not constitute such uses. We therefore hold that the CRC erred in·concluding that the "withdrawal of water from the aquifer underlying the [Reserve] . . . is a public use consistent with preservation of the area in an undeveloped state and consistent with the coastal reserve's primary use as a site for research and education" and affirm the court's conclusions number 4 through 8 and 13.

### V. REVIEW OF ADDITIONAL CRC CONCLUSIONS

Finally, we address respondents' assignments of error with respect to the court's conclusions 9 through 11. With respect to the

out of approximately 220 acres of upland forest will be disturbed. None of the approximately 240 acres of wetlands currently in the Coastal Reserve will be disturbed by the permitted activities. In addition, nearly half of the permitted activities will take place in an area of Buxton Woods which was clear-cut within the last approximately 20 years and which now contains much shrub growth. This small amount of disturbance will not have a significant impact on the maritime forest or the wetlands and will not lead to fragmentation of the Coastal Reserve's natural systems.

court's conclusions 9 and 10, respondents argue that the CRC correctly concluded that either the *de minimis* disturbance was not proscribed by N.C. Admin. Code tit. 15A, r.070.0202(6) (the regulation prohibiting the removal or disturbance of vegetation within a Coastal Reserve) or that such regulation was void under the facts of this case. Since respondents' argument is premised on its incorrect interpretation of the term "public use," we overrule these assignments of error. With respect to the court's conclusion number 11, that the CRC erred in determining that no practicable alternative exists, respondents argue that it was incorrect because the CRC's determination was supported by its findings of fact. We disagree. Respondents misconstrue the court's conclusion. The court did not conclude that the CRC's determination as to the absence of a practicable alternative was not supported by its findings of fact. Rather, the court implicitly concluded that, where the permitted activities are prohibited by the Coastal Reserve Statute, a permit should not be granted under N.C. Gen. Stat. § 113A-120(a).

In conclusion, we hold that Wake County had subject matter jurisdiction over petitioner's appeal and thus affirm the denial of respondents' motion to dismiss. We further hold that the activities permitted by Major Development Permit No. 152-91 are not "public uses" as that term is employed in N.C. Gen. Stat. § 113A-129.2(e) and are thus prohibited by the Coastal Reserve Statute. For this reason, we affirm the order entered 28 October 1993 by Judge Griffin in Dare County Superior Court which overrules the CRC's final decision and revokes the permit.

Affirmed.

Judges JOHNSON and MARTIN concur.

This opinion was written and concurred in prior to December 29, 1994.