IN THE MATTER OF: BEFORE THE NORTH CAROLINA PESTICIDE BOARD, FILE NOS. IR94-128, IR94-151, IR94-155, H. RAY MEADS, PETITIONER v. NORTH CAROLINA DEPARTMENT OF AGRICULTURE, FOOD AND DRUG PROTECTION DIVISION, PESTICIDE SECTION, RESPONDENT

No. 139A98

(Filed 31 Dec. 1998)

**1. Agriculture § 30 (NCI4th)— aerial spraying of pesticide— application within three hundred feet of business—violation of regulation**

Substantial evidence supported a decision by the Pesticide Board that petitioner, an aerial pesticide applicator, violated a pesticide regulation prohibiting the aerial application of a pesticide within three hundred feet of an occupied business where the evidence showed that petitioner aerially applied a pesticide to a soybean field during morning hours when a nearby business was occupied, and vegetation samples collected 234 feet from the business contained .10 ppm of Permethrin.

**2. Agriculture § 30 (NCI4th)— aerial spraying of pesticide— application within twenty-five feet of roadway—violation of regulation**

Substantial evidence supported a decision by the Pesticide Board that petitioner violated a pesticide regulation prohibiting the aerial application of a pesticide within twenty-five feet of a roadway where the evidence tended to show that vegetation samples taken within four feet of a road the day after petitioner sprayed a soybean field with a pesticide contained .17 ppm of Permethrin on the east side of the road and .54 ppm of that substance on the west side of the road.

**3. Agriculture § 30 (NCI4th)— aerial spraying of pesticide— application within one hundred feet of residence—violation of regulation**

Substantial evidence supported a decision by the Pesticide Board that petitioner violated a pesticide regulation prohibiting the application of a pesticide within one hundred feet of a residence where the evidence tended to show that the day after petitioner aerially applied a pesticide to a soybean field, two vegetation samples collected within forty-seven and sixty feet of a nearby residence contained .10 ppm and .44 ppm of Permethrin; the pesticide label states that the product causes moderate eye irritation; and the person living in the residence encountered a vapor that made her eyes burn and her lips tingle.

**4. Agriculture § 30 (NCI4th)— aerial spraying of pesticide— use inconsistent with label—sufficient evidence**

Substantial evidence supported a conclusion by the Pesticide Board that petitioner violated statutes making it unlawful to use any pesticide inconsistent with its label where the evidence tended to show that petitioner aerially applied a pesticide to a soybean field; the pesticide label stated that the pesticide should not be applied so as to directly and through drift expose workers or other persons; a resident of land adjoining the soybean field was exposed to a vapor containing the pesticide; and the pesticide was found on vegetation on the land adjoining the soybean field. N.C.G.S. §§ 143-443(b)(3), 143-456(a)(2), and 143-469(b)(2).

**5. Agriculture § 30 (NCI4th)— aerial pesticide applicator— operation in careless or negligent manner**

Substantial evidence supported a conclusion by the Pesticide Board that petitioner aerial pesticide applicator violated the

MEADS v. N.C. DEP'T OF AGRIC.

[349 N.C. 656 (1998)]

statute providing that the Board may revoke a license upon find-
ing that the licensee has operated in a faulty, careless or negligent
manner where the evidence showed that petitioner aerially
applied a pesticide to a soybean field; a person living on adjoin-
ing land exited her home and encountered vapor that made her
eyes burn and her lips tingle; and numerous traces of the pesti-
cide were found on vegetation outside the target area.

**6. Agriculture § 30 (NCI4th)— aerial pesticide regulations—
buffer zones—meaning of "deposit"**

As used in the pesticide regulation creating buffer zones
where it is unlawful to "deposit" pesticides, two NCAC
9L .1005(e), the term "deposit" means "to let fall." Accordingly, an
aerial pesticide applicator violates this regulation whenever he
takes any action which results in either the direct or indirect
(e.g., drift) falling or placement of a pesticide within a restricted
buffer zone.

**7. Agriculture § 30 (NCI4th)— aerial pesticide application—
inconsistency with label—no reliance on obsolete labeling
restriction**

The Pesticide Board did not improperly rely upon an obsolete
labeling restriction when it determined that petitioner aerially
applied a pesticide in a manner inconsistent with its labeling in
violation of state statutes where the Board relied upon a labeling
restriction stating that the pesticide should not be applied "in
such a manner as to directly or through drift *expose* workers or
other persons," although the EPA had changed the required warn-
ing to state that the pesticide should not be distributed or sold "in
a way that will *contact* workers or other persons, either directly
or through drift," where a grace period applied so that the new
warning label was not required at the time petitioner applied the
pesticide in question, and petitioner was not subject to the EPA's
amended labeling restrictions because he was not a distributor or
seller of pesticides. Therefore, the Pesticide Board was permitted
to apply the pesticide label restrictions as they existed at the time
of petitioner's application of the pesticide.

**8. Agriculture § 30 (NCI4th)— aerial pesticide application—
inconsistency with label—statutory violations—sufficiency
of evidence**

Under N.C.G.S. §§ 143-443(b)(3), 143-456(a)(2), and
143-469(b)(2), an aerial pesticide applicator was forbidden to

**MEADS v. N.C. DEP'T OF AGRIC.**

[349 N.C. 656 (1998)]

apply a pesticide in a manner inconsistent with any written, printed, or graphic material located upon its container and its accompanying materials at or before the time of application. Furthermore, the evidence was sufficient for the Pesticide Board to find that the applicator applied a pesticide in a manner inconsistent with its label warning that it should not be applied in a manner "as to directly or through drift expose workers or other persons" where it tended to show that the applicator aerially sprayed a soybean field, and when the resident of property adjoining the soybean field exited her home on that day, she encountered a vapor that made her eyes burn and her lips tingle.

9. **Administrative Law and Procedure § 52 (NCI4th)— constitutionality of pesticide regulations—jurisdiction of trial court—exhaustion of administrative remedies not required**

An aerial pesticide applicator who was fined and had his aerial pesticide license revoked by the Pesticide Board was not required, in order to argue before the trial court the constitutionality of aerial pesticide regulations creating certain buffer zones, to exhaust administrative remedies by (1) petitioning the Pesticide Board to amend or appeal the regulation pursuant to N.C.G.S. § 150B-20, or (2) requesting a declaratory ruling from the Pesticide Board pursuant to N.C.G.S. § 150B-4, since it is in the province of the judiciary to make constitutional determinations, and any effort made by the applicator to have the constitutionality of the regulations determined by the Pesticide Board would have been in vain.

10. **Agriculture § 30 (NCI4th)— aerial pesticide regulations— buffer zones—not due process violation**

Aerial pesticide buffer-zone regulations that prohibit depositing a pesticide within specified distances of schools, hospitals, nursing homes, churches, occupied businesses, roadways, and areas where aquatic life may be harmed do not violate due process under the United States or North Carolina Constitutions because they have the legitimate objective of protecting both people and the environment from the harmful risks accompanying pesticide application, and they utilize a reasonable means of accomplishing this objective. These regulations do not violate due process because they fail to distinguish between harmless and harmful deposit levels or because they do not involve a deter-

mination of whether the deposit was intentional, purposeful, or willfully negligent.

**11. Agriculture § 30 (NCI4th)— aerial pesticide regulations— buffer zones—not equal protection violation**

Buffer-zone pesticide regulations do not violate equal protection under the United States or North Carolina Constitutions because they treat aerial pesticide applicators differently from ground pesticide applicators since the increased risk of harm to people and the environment associated with aerial applications mandates treating aerial applicators in a distinct manner.

Appeal by respondent pursuant to N.C.G.S. § 7A-30(2) of an unpublished decision of a divided panel of the Court of Appeals, 128 N.C. App. 750, 498 S.E.2d 210 (1998), affirming an order entered by Farmer, J., on 7 February 1997 in Superior Court, Wake County. On 8 July 1998, the Supreme Court allowed petitioner's petition for discretionary review of additional issues. Heard in the Supreme Court 18 November 1998.

*Hatch, Little & Bunn, L.L.P., by David H. Permar and Tina L. Frazier, for petitioner-appellant and -appellee.*

*Michael F. Easley, Attorney General, by Melissa H. Taylor, Assistant Attorney General, for respondent-appellant and -appellee.*

*Southern Environmental Law Center, by Donnell Van Noppen III, Senior Attorney, on behalf of Agricultural Resources Center, Inc., amicus curiae.*

WYNN, Justice.

We are asked in this appeal to determine whether the North Carolina Pesticide Board properly penalized an aerial pesticide applicator for violating various North Carolina pesticide regulations. On initial review, our Court of Appeals affirmed the trial court's reversal of the Pesticide Board's decision. Finding error, we reverse the decision of the Court of Appeals and reinstate the Pesticide Board's decision.

On 26 August 1994, petitioner H. Ray Meads ("Meads") aerially sprayed the pesticide Pounce on James Duncan's ("Duncan") soybean

field located on S.R. 1148[1] in Currituck County. On that same day, Mary Jo Windley ("Windley"), a Currituck County resident whose property adjoins the Duncan field, exited her home and encountered a vapor that made her eyes burn and her lips tingle. Consequently, Windley complained to the North Carolina Department of Agriculture, Food and Drug Protection Division, Pesticide Section ("NCDA").

In response, on 27 August 1994, an NCDA inspector collected vegetation samples from the east and west sides of S.R. 1148, the Windley yard, and the target soybean field. Analysis of the samples revealed varying levels of Permethrin, an active ingredient in Pounce, ranging from 1.6 parts per million ("ppm") in the sprayed target field to .10 ppm in the Windley yard. Permethrin traces were also discovered within twenty-five feet of S.R. 1148; one-hundred feet of Windley's residence; and three-hundred feet of Royster Clark, Inc., a nearby business open at the time of Meads' Pounce application.

On 28 November 1994, the NCDA issued Meads a notice violation citing his alleged violation of the North Carolina pesticide law and regulations.[2] Subsequently, the Pesticide Board held a hearing and concluded that Meads violated N.C.G.S. §§ 143-443(b); 143-469(b)(2); and 143-456(a)(2), (4), and (5) by applying Pounce in a manner inconsistent with its label. The Pesticide Board also concluded that Meads violated N.C.G.S. § 143-456(a)(4) by applying Pounce in a faulty, careless, or negligent manner. Lastly, the Pesticide Board concluded that Meads violated North Carolina Administrative Rule 2 NCAC 9L .1005(b), (c), and (e), respectively, by aerially depositing pesticide within three-hundred feet of the nearby business Royster Clark, Inc.; twenty-five feet of S.R. 1148; and one-hundred feet of the Windley residence. Under N.C.G.S. §§ 143-469(a)(2) and 143-456(a)(5), the Pesticide Board assessed Meads a $1,000 fine and revoked his aerial pesticide license for one year. Thereafter, Meads sought judicial review of the Pesticide Board's decision in Superior Court, Wake County.

In an order entered 7 February 1997, the trial court concluded that the Pesticide Board improperly interpreted rule 2 NCAC 9L .1005

---

1. S.R. 1148 is also known as North Gregory Road.

2. NCDA issued two other notice violations to Meads on 28 November 1994 for violations of N.C.G.S. § 143-456(a)(5) and 2 NCAC 9L .1005(c). The North Carolina Pesticide Board, however, did not assess a penalty for these violations. Additionally, Meads did not contest the Board's findings regarding these cases.

and erred in its application of obsolete labeling restrictions. Additionally, the court concluded that the Pesticide Board's decision was arbitrary, capricious, and unsupported by substantial evidence. Lastly, the court concluded that the buffer-zone regulations set forth in rule 2 NCAC 9L .1005 violated Meads' constitutional due process and equal protection rights. Accordingly, the trial court reversed the Pesticide Board's decision.

Our Court of Appeals, in an unpublished opinion, affirmed the trial court's ruling that the Pesticide Board's decision was arbitrary, capricious, and unsupported by substantial evidence. *See Meads v. N.C. Dep't of Agric.*, 128 N.C. App. 750, 498 S.E.2d 210 (1998). Because this issue was determinative of the case, the Court of Appeals did not address the trial court's conclusion that the regulations and accompanying penalties violated Meads' constitutional due process and equal protection rights. In dissent, Judge Greene concluded that "the whole record contains substantial evidence to support the [Pesticide] Board's determination."

We are now asked to determine: (1) whether the Pesticide Board's decision was supported by substantial evidence, (2) whether the Pesticide Board's decision was based upon errors of law, and (3) whether the buffer-zone regulations set forth in rule 2 NCAC 9L .1005 violate the Due Process and Equal Protection Clauses of both the United States and North Carolina Constitutions. We address each issue seriatim.

## I. WHETHER SUBSTANTIAL EVIDENCE SUPPORTED THE PESTICIDE BOARD'S DECISION

As an administrative agency, the Pesticide Board is subject to the North Carolina Administrative Procedure Act ("APA"), codified at chapter 150B of the General Statutes. *See Amanini v. N.C. Dep't of Human Resources*, 114 N.C. App. 668, 673, 443 S.E.2d 114, 117 (1994). Under the APA, a reviewing court may reverse or modify an agency's decision if the petitioner's substantial rights may have been prejudiced by findings, inferences, conclusions, or decisions which are arbitrary, capricious, or unsupported by substantial evidence. *See* N.C.G.S. § 150B-51(b) (1991).

Under N.C.G.S. § 150B-51(b), the proper standard of review "depends upon the issues presented on appeal." *In re Appeal by McCrary*, 112 N.C. App. 161, 165, 435 S.E.2d 359, 363 (1993). When the reviewing court is determining whether an agency's decision was

arbitrary, capricious, or unsupported by substantial evidence, as we are in the instant case, it must apply the "whole record" test. *See Amanini*, 114 N.C. App. at 674, 443 S.E.2d at 118.

"The 'whole record' test requires the reviewing court to examine all competent evidence (the 'whole record') in order to determine whether the agency decision is supported by 'substantial evidence.' " *Id.* (quoting *Rector v. N.C. Sheriffs' Educ. & Training Standards Comm'n*, 103 N.C. App. 527, 532, 406 S.E.2d 613, 616 (1991)). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State ex rel. Comm'r of Ins. v. N.C. Fire Ins. Rating Bureau*, 292 N.C. 70, 80, 231 S.E.2d 882, 888 (1977). Therefore, if we conclude there is substantial evidence in the record to support the Board's decision, we must uphold it. *See McCrary*, 112 N.C. App. at 168, 435 S.E.2d at 365. We note that while the whole-record test " 'does require the court to take into account both the evidence justifying the agency's decision and the contradictory evidence from which a different result could be reached,' " *id.* at 167-68, 435 S.E.2d at 364 (quoting *Lackey v. N.C. Dep't of Human Resources*, 306 N.C. 231, 238, 293 S.E.2d 171, 176 (1982)), the test "does not allow the reviewing court to replace the Pesticide Board's judgment as between two reasonably conflicting views, even though the court could justifiably have reached a different result had the matter been before it *de novo*," *Thompson v. Wake County Bd. of Educ.*, 292 N.C. 406, 410, 233 S.E.2d 538, 541 (1977).

As stated, the Pesticide Board concluded that Meads violated 2 NCAC 9L .1005(b), (c), and (e) and N.C.G.S. §§ 143-443(b)(3), 143-456(a)(2), and 143-469(b)(2). We address each violation respectively.

[1] Under 2 NCAC 9L .1005(b), it is unlawful to aerially apply a pesticide within three-hundred feet of an occupied business. The Pesticide Board, in concluding that Meads violated this rule, initially noted that Meads aerially applied Pounce on Duncan's soybean field at some point between 9:30 and 11:00 a.m.—a time during which the nearby business Royster Clark, Inc., was occupied. The Pesticide Board found that vegetation samples collected approximately 234 feet from Royster Clark, Inc., contained .10 ppm of Permethrin. From these facts, the Pesticide Board concluded that Meads improperly applied pesticide within three-hundred feet of an occupied business in violation of 2 NCAC 9L .1005(b). We conclude that this evidence provides sufficient support for the Pesticide Board's ruling.

Therefore, we reverse the Court of Appeals' decision that the Pesticide Board's holding with respect to this issue was arbitrary, capricious, and unsupported by substantial evidence.

[2] Under 2 NCAC 9L .1005(c), pesticide may not be aerially applied within twenty-five feet of a roadway. The Pesticide Board, in determining that Meads violated this rule, found that a vegetation sample taken four feet from the pavement along the east side of S.R. 1148 contained .17 ppm of Permethrin, while a vegetation sample taken three feet from the pavement along the west side of S.R. 1148 contained .54 ppm of that same substance. This evidence constitutes substantial evidence to support the Pesticide Board's decision that Meads violated this rule. Thus, we reverse the Court of Appeals' decision to the extent that it found that the Pesticide Board's holding with respect to this rule was arbitrary, capricious, and unsupported by substantial evidence.

[3] Under 2 NCAC 9L .1005(e), pesticide may not be aerially applied within one-hundred feet of a residence. In ruling that Meads violated this rule, the Pesticide Board noted that two vegetation samples collected within forty-seven and sixty feet of Ms. Windley's residence contained .10 ppm and .44 ppm of Permethrin, respectively. Moreover, the Pesticide Board noted that the Pounce label provides that the product "[c]auses moderate eye irritation." The Pesticide Board concluded that the evidence showing that Ms. Windley's eyes burned and her lips tingled showed that there were traces of Pounce within the restricted area. We agree. Accordingly, we reverse the Court of Appeals' decision that the Pesticide Board's holding with respect to this rule was arbitrary, capricious, and unsupported by substantial evidence.

[4] We next address the Court of Appeals' holding that the Pesticide Board's conclusion that Meads violated certain statutes was unsupported by substantial evidence. The Pesticide Board found that Meads violated N.C.G.S. §§ 143-443(b)(3), 143-456(a)(2), and 143-469(b)(2), which make it unlawful for any person to use any pesticide inconsistent with its label. At the time of Meads' aerial application, the Pounce label read in pertinent part: "Do not apply this product in such a manner as to directly or through drift expose workers or other persons." As stated, the Pesticide Board concluded that Ms. Windley was exposed to Pounce upon exiting her home, as evidenced by her irritated eyes and tingling lips—symptoms associated with Pounce exposure. This evidence, combined with the undisputed

**MEADS v. N.C. DEP'T OF AGRIC.**

[349 N.C. 656 (1998)]

fact that Meads aerially applied Pounce to land adjoining Ms. Windley's lot, provides substantial evidence to support the Pesticide Board's conclusion that Meads violated these statutes. Therefore, to the extent that the Court of Appeals overturned the Pesticide Board's decision with respect to these statutory sections, we reverse.

**[5]** Lastly, we address the Pesticide Board's conclusion that Meads violated N.C.G.S. § 143-456(a)(4), which provides that the Pesticide Board may revoke a license upon finding that the licensee has operated in a faulty, careless, or negligent manner. The preceding evidence, standing alone, provides substantial evidence that Meads' aerial application of Pounce was faulty, careless, or negligent. Additionally, we note that the Pesticide Board further supported its conclusion by pointing to the numerous traces of Permethrin found outside of the target area. Thus, these facts provide substantial evidence to support the Pesticide Board's conclusion regarding this issue.

## II. ERRORS OF LAW

We next consider whether the trial court correctly concluded that the Pesticide Board: (1) erroneously interpreted the buffer zone regulations set forth in rule 2 NCAC 9L .1005; and (2) erroneously applied an obsolete labeling restriction when concluding that Meads violated N.C.G.S. §§ 143-443(b)(3), 143-456(a)(2), and 143-469(b)(2) by applying Pounce in a manner inconsistent with its label. Because this issue involves an error of law, N.C.G.S. § 150B-51(b)(4) directs us to utilize *de novo* review. *See Friends of Hatteras Island v. Coastal Resources Comm'n*, 117 N.C. App. 556, 567, 452 S.E.2d 337, 344 (1995).

## A. BUFFER-ZONE REGULATIONS

**[6]** Initially, we determine whether the Pesticide Board erroneously interpreted the term "deposited" as it is used in rule 2 NCAC 9L .1005. Meads argues that the Pesticide Board improperly equated the term "deposited" with the term "detected" when concluding that he unlawfully "deposited" Pounce within the restricted buffer zones.

Rule 2 NCAC 9L .1005 contains the term "deposited" in three pertinent areas. First, 2 NCAC 9L .1005(b) provides that "[n]o pesticide shall be deposited by aircraft within 300 feet of the premises of . . . any building (other than a residence) which is used for business or social activities if either the premises or the building is occupied by people." Further, 2 NCAC 9L .1005(c) provides that "[n]o pesticide

shall be deposited by aircraft on the right-of-way of a public road or within 25 feet of the road, whichever is the greater distance." Lastly, 2 NCAC 9L .1005(e) provides that "[n]o pesticide shall be deposited within 100 feet of any residence." In conjunction, these areas constitute "buffer zones" where it is unlawful to "deposit" pesticides.

Meads argues that the term "deposited," as utilized in the preceding rules, requires a finding that Meads himself "deposited" Pounce within the restricted buffer zone. According to Meads, the only evidence that he "deposited" Pounce within these zones was samples taken from those areas which indicated traces of Permethrin. Meads contends that this evidence shows that Pounce was "detected" in those zones, not "deposited" there.

When a term is not defined or provided a technical meaning, this Court will construe it in accordance with its ordinary meaning. *See State v. Coker*, 312 N.C. 432, 435, 323 S.E.2d 343, 346 (1984). According to *Webster's Dictionary*, the term "deposit" is defined as "to let fall (as sediment)." *Merriam-Webster's Collegiate Dictionary* 310 (10th ed. 1993). Using this definition in the context of aerial pesticide application, we conclude that the term "deposit" refers to any action which results in either the direct or indirect (e.g., drift) falling or placement of pesticide within a restricted buffer zone.

We find further support for this conclusion by using the well-settled principle that provisions should be construed in a manner which tends to prevent them from being circumvented. *See Friends of Hatteras*, 117 N.C. App. at 573, 452 S.E.2d at 348. In the case *sub judice*, Meads argues that we should construe the term "deposited" to include only *intentional* aerial applications of pesticides in a restricted buffer zone. Meads' construction, however, encourages contravention of this rule by allowing aerial applicators to defend their actions based upon an almost unascertainable mental intent. That is, an applicator can simply plead ignorance to a zone's restricted status or to the principles of drift. This, in turn, could allow aerial applicators to carelessly apply pesticides by granting them the "I didn't mean for the pesticides to deposit there" defense.

In summation, we conclude that the trial court correctly concluded that the term "deposited," as set forth in rule 2 NCAC 9L .1005, means "to let fall." Accordingly, an aerial pesticide applicator violates this rule whenever he takes any action which results in either the direct or indirect (e.g., drift) falling or placement of pesticide within a restricted buffer zone.

## B.  DID THE PESTICIDE BOARD RELY ON OBSOLETE LABELING

[7] We now address Meads' contention that the Pesticide Board improperly relied upon an obsolete labeling restriction when it determined that he applied Pounce in a manner inconsistent with its labeling. Specifically, the Pesticide Board rested its decision upon a labeling restriction which states that Pounce should not be applied "in such a manner as to directly or through drift *expose* workers or other persons." (Emphasis added.) The Environmental Protection Agency ("EPA") requires this warning on every pesticide label. *See* 7 U.S.C. § 136v(b) (1992). The warning itself, however, was changed by the EPA on 20 October 1992 to read: "Do not apply this product in a way that will contact workers or other persons, either directly or through drift." 40 C.F.R. § 156.206(a) (1993). Meads argues that there is a significant difference between the terms "expose" and "contact" and that the Pesticide Board erred in relying upon the old label and its use of the word "expose."

As stated, on 20 October 1992, the EPA changed its pesticide-labeling restriction. Under 40 C.F.R. § 156.200, which governs the scope and applicability of the amended labeling restriction, "[n]o product to which this subpart applies shall be *distributed or sold* without amended labeling by any registrant after April 21, 1994"; and "[n]o product to which this subpart applies shall be *distributed or sold* without the amended labeling by any *person* after October 23, 1995." 40 C.F.R. § 156.200(c)(3), (4) (1993) (emphasis added). Therefore, 40 C.F.R. § 156.200 contained a grace period during which the affected parties could sell or distribute their products without the amended label. Further, the length of this grace period was based upon the seller or distributor's status—that is, whether the affected party was a registrant or person.

In the case *sub judice*, Meads was not a registrant, and therefore the labeling restriction was inapplicable until 23 October 1995. Because the alleged improper application occurred in August 1994, the amended labeling restriction did not apply.

Moreover, 7 U.S.C. § 136(gg) defines the phrase "to distribute or sell" as to distribute, sell, offer for sale, hold for distribution, hold for sale, hold for shipment, ship, deliver for shipment, release for shipment, or receive and (having so received) deliver or offer to deliver. Under this definition, so long as a pesticide applicator does not deliver unapplied pesticide to an individual, the applicator does not "distribute or sell" it by simply holding or applying it as part of a pest

removal service. 7 U.S.C. § 136(gg) (1992). Indeed, any applicator who holds or applies registered pesticides or who uses dilutions of registered pesticides only to provide a service of controlling pests without delivering any unapplied pesticide to any person so served is not deemed to be a seller or distributor of pesticides. 7 U.S.C. § 136(e)(1).

In the case *sub judice*, Meads was a "certified applicator" of pesticides whose sole service involved the control of pests. Meads never provided any individual with unapplied pesticide. Accordingly, because Meads was not a distributor or seller of pesticides, he was not subject to the EPA's amended labeling restrictions.

[8] Although Meads was not bound by the EPA's amended labeling restrictions, the Board was nonetheless permitted to apply the Pounce label restrictions as they existed at the time of Meads application. Under N.C.G.S. §§ 143-443(b)(3), 143-456(a)(2), and 143-469(b)(2), an applicator may not apply a pesticide in a manner inconsistent with its label. "The term 'label' means the written, printed, or graphic matter on, or attached to, the pesticide (or device) or the immediate container thereof, and the outside container or wrapper of the retail package, if any there be, of the pesticide (or device)." N.C.G.S. § 143-460(19) (1993). Further, the term "labeling" means all labels and other written, printed, or graphic matter which, at any time, were placed upon or accompanied the pesticide, its wrappers, or containers. N.C.G.S. § 143-460(20). Accordingly, Meads was forbidden to apply the pesticide in a manner inconsistent with any written, printed, or graphic material located upon Pounce and its accompanying materials at or before the time of application.

In August 1994, the time of Meads' alleged improper application, the Pounce label stated in pertinent part: "Do not apply this product in such a manner as to directly or through drift expose workers or other persons." Indeed, the Pounce label, which was not required to be changed until 23 October 1995, still contained the old label at the time of Meads' application. Therefore, the Pesticide Board was correct in relying on that label.

With respect to whether Meads applied the pesticide in a manner inconsistent with the label, we note that the term "expose," as used in this context, is defined as "subject to risk from a harmful action or condition." *Merriam-Webster's Collegiate Dictionary* 410. In the case *sub judice*, drift from Meads' aerial application of Pounce entered upon the Windley property. Moreover, Ms. Windley encountered the

drift, as evidenced by her irritated eyes and tingling lips. This encounter subjected Ms. Windley to risk from a harmful condition and therefore exposed her to the product in violation of N.C.G.S. §§ 143-443(b)(3), 143-456(a)(2), and 143-469(b)(2). Accordingly, the Pesticide Board correctly determined that Meads applied Pounce in a manner inconsistent with its label. Therefore, we reverse the Court of Appeals to the extent that it concluded that the Pesticide Board relied upon an obsolete labeling restriction.

## III.  CONSTITUTIONALITY

We now reach the issue of whether the buffer-zone regulations set forth in rule 2 NCAC 9L .1005 violate the constitutional rights of due process and equal protection.

[9] Initially, we address the NCDA's contention that the trial court lacked subject-matter jurisdiction over this issue as a result of Meads' alleged failure to exhaust his administrative remedies. The NCDA contends that Meads, before arguing the constitutionality of the regulations in the trial court, was required to pursue one of two options: (1) petition the Pesticide Board to amend or repeal the regulation pursuant to N.C.G.S. § 150B-20, or (2) request a declaratory ruling from the Pesticide Board pursuant to N.C.G.S. § 150B-4. We conclude that the NCDA's argument is without merit.

Under N.C.G.S. § 150B-43:

> Any person who is aggrieved by the final decision in a contested case, and who has exhausted all administrative remedies made available to him by statute or agency rule, is entitled to judicial review of the decision under this Article, unless adequate procedure for judicial review is provided by another statute . . . .

N.C.G.S. § 150B-43 (1991). Accordingly, that statute sets forth five requirements that a party must satisfy before seeking review of an adverse administrative determination: "(1) the person must be aggrieved; (2) there must be a contested case; (3) there must be a final agency decision; (4) administrative remedies must be exhausted; and (5) no other adequate procedure for judicial review can be provided by another statute." *Huang v. N.C. State Univ.*, 107 N.C. App. 710, 713, 421 S.E.2d 812, 814 (1992).

In the case *sub judice*, Meads has satisfied all five requirements. First, the fine and revocation levied against Meads clearly make him

an aggrieved party. Second, this case is "contested" because it involves an administrative proceeding to resolve a dispute between an agency and another person with respect to licensing and the levying of a monetary fine. *See* N.C.G.S. § 150B-2(2) (1991) (a "contested case" is one which involves "an administrative proceeding . . . to resolve a dispute between an agency and another person that involves the rights, duties, or privileges, including licensing or the levy of a monetary penalty"). Further, the final three requirements are met because the Pesticide Board's decision constituted a final agency decision which left Meads without an administrative remedy or other adequate statutory procedure for judicial review.

In the NCDA's exhaustion argument, it contends that the two administrative options stated above constituted adequate alternative procedures for judicial review. Therefore, the NCDA argues that Meads was required to exhaust them pursuant to our fourth and fifth requirements. The NCDA's argument, however, ignores our well-settled rule that a statute's constitutionality shall be determined by the judiciary, not an administrative board. *See Great Am. Ins. Co. v. Gold*, 254 N.C. 168, 118 S.E.2d 792 (1961); *see also Johnston v. Gaston County*, 71 N.C. App. 707, 323 S.E.2d 381 (1984), *disc. rev. denied*, 312 N.C. 508, 329 N.C. 392 (1985). Because it is the province of the judiciary to make constitutional determinations, any effort made by Meads to have the constitutionality of the buffer-zone regulations determined by the Pesticide Board would have been in vain. Accordingly, given the constitutional nature of this issue, the NCDA options were inadequate, and therefore Meads was not required to exhaust them. Thus, Meads satisfied the aforementioned requirements and was entitled to judicial review.

With respect to the pertinent question of whether rule 2 NCAC 9L .1005 is constitutional, we note that our scope of review is governed by N.C.G.S. § 150B-51(b)(1). Under that statute, this Court, when reviewing an agency decision, may reverse or modify the decision if the petitioner's substantial rights may have been prejudiced by findings, inferences, conclusions, or decisions which violate the North Carolina or United States Constitution. Further, when a petitioner alleges that an agency violated his constitutional rights, this Court will undertake *de novo* review. *See Air-A-Plane Corp. v. N.C. Dep't of Envir., Health & Natural Resources*, 118 N.C. App. 118, 124, 454 S.E.2d 297, 301, *disc. rev. denied*, 340 N.C. 358, 458 S.E.2d 184 (1995).

## A. DUE PROCESS

**[10]** Under federal due process jurisprudence, legislation is presumed constitutional unless it involves a suspect classification or impinges upon a fundamental personal right. *See City of New Orleans v. Dukes,* 427 U.S. 297, 49 L. Ed. 2d 511 (1976) (per curiam); *Pollard v. Cockrell,* 578 F.2d 1002 (5th Cir. 1978); *Kennedy v. Hughes,* 596 F. Supp. 1487 (D. Del. 1984). Further, legislation which is presumed constitutional passes federal constitutional muster so long as it is rationally related to a legitimate state interest. *See Ferguson v. Skrupa,* 372 U.S. 726, 10 L. Ed. 2d 93 (1963).

Under North Carolina jurisprudence, state "due process" is governed by Section 19 of the Constitution of North Carolina, which provides that "[n]o person shall be deprived of his life, liberty, or property, but by the law of the land." N.C. Const. art. I, § 19. Although this Court often considers the "law of the land" synonymous with "due process of law," *see A-S-P Assocs. v. City of Raleigh,* 298 N.C. 207, 258 S.E.2d 444 (1979), we have reserved the right to grant Section 19 relief against unreasonable and arbitrary state statutes in circumstances where relief might not be obtainable under the Fourteenth Amendment to the United States Constitution, *see Lowe v. Tarble,* 313 N.C. 460, 329 S.E.2d 648 (1985). Nonetheless, the two-fold constitutional inquiry under both the North Carolina and United States Constitutions is the same: (1) Does the regulation have a legitimate objective; and (2) if so, are the means chosen to implement that objective reasonable? *See A-S-P Assocs.,* 298 N.C. 207, 258 S.E.2d 444; *Treants Enters. v. Onslow County,* 83 N.C. App. 345, 350 S.E.2d 365 (1986), *aff'd,* 320 N.C. 776, 360 S.E.2d 783 (1987).

The objectives underlying North Carolina's pesticide regulations are set forth in the preamble to the pesticide law. *See* N.C.G.S. § 143-435 (1993). According to that section, pesticide regulations were adopted "to regulate in the public interest the use, application, sale, disposal and registration of insecticides, fungicides, herbicides, defoliants, desiccants, plant growth regulators, nematicides, rodenticides, and any other pesticides designated by the North Carolina Pesticide Board." N.C.G.S. § 143-435(b). The preamble to the pesticide law provides that

pesticides . . . may seriously injure health, property, or wildlife if not properly used. Pesticides may injure man or animals, either by direct poisoning or by gradual accumulation of poisons in the tissues. Crops or other plants may also be injured by their

improper use. The drifting or washing of pesticides into streams or lakes can cause appreciable danger to aquatic life. A pesticide applied for the purpose of killing pests in a crop, which is not itself injured by the pesticide, may drift and injure other crops or nontarget organisms with which it comes in contact.

*Id.*

The buffer-zone regulations questioned by Meads concern the aerial application of pesticides. Specifically, the buffer-zone regulations prohibit depositing pesticide within enumerated distances of schools, hospitals, nursing homes, churches, occupied businesses, roadways, and areas where aquatic life may be harmed. *See* 2 NCAC 9L .1005 (July 1988). A plain reading of these regulations, in conjunction with the preamble to the pesticide law, convincingly demonstrates that the overriding objective behind our pesticide law is to protect both people and the environment from the harmful risks accompanying pesticide application. Undoubtedly, this is a legitimate objective.

Given our determination that the regulations were created to achieve a legitimate objective, we must now determine whether they utilize a reasonable means of accomplishing it. In making this determination, we note that the Pesticide Board's rule "is endowed with a presumption of legislative validity, and the burden is on [the party challenging the rule] to show that there is no rational connection between the Board's action and its conceded interest." *Harrah Indep. Sch. Dist. v. Martin*, 440 U.S. 194, 198, 59 L. Ed. 2d 248, 254 (1979). Further, the party challenging the rule must prove that the state agency's action is so irrational that no reasonable conception could justify it. *See Chambers Med. Techs. of S.C., Inc. v. Bryant*, 52 F.3d 1252, 1263 (4th Cir. 1995).

As stated, the underlying purpose behind the pesticide regulations is to reduce or eliminate the risk harmful pesticides place upon humans and the environment. The Pesticide Board determined that the best way to achieve this purpose was to flatly prohibit the depositing of pesticides in certain areas. The logic is simple: If the source of the harm is eliminated, so is the harm itself. This logical connection demonstrates that the Pesticide Board chose a means which is rationally related to its legitimate objective.

In concluding that the buffer-zone regulations violated due process, the trial court based its decision upon two factors: (1) the

**MEADS v. N.C. DEP'T OF AGRIC.**

[349 N.C. 656 (1998)]

regulations failed to distinguish between harmless and harmful deposit levels; and (2) the regulations do not involve a determination of whether the "deposit" was intentional, purposeful, or willfully negligent. We conclude that the trial court's reliance on these factors was misplaced.

With respect to the trial court's finding that the regulations do not discriminate between harmless and harmful pesticide deposit levels, we conclude that the trial court improperly considered this factor. In the case *sub judice*, the undisputed facts demonstrate that Meads' deposit was significant enough to constitute a harmful deposit. Indeed, Meads' own expert testified that the levels found within the rights-of-way and around the Windley home were sufficient to kill beneficial insects and possibly cause Ms. Windley harm. Therefore, the trial court's reliance upon harmless versus harmful levels had no place in the present case.

Additionally, we note that a restriction which prohibits some activities that are harmful as well as some that are safe is not *per se* unconstitutional. *See, e.g., Empire Kosher Poultry, Inc. v. Hallowell*, 816 F.2d 907, 913 (3d Cir. 1987) (geographical perimeters of the quarantine zone bore a rational connection to the objective sought; indeed, these "boundaries were selected to cover areas of known infection and to include a five-mile buffer zone so that they could be readily identifiable, thereby avoiding poultry being inadvertently shipped through or out of the quarantine areas"). For example, numerous drugs and pesticides like DDT have been banned from this country even though they may be beneficial for certain uses at specified levels. Further, under the rational-relation test, the means utilized to achieve a legitimate objective need not be narrowly tailored and can be constitutional even though they may be broader than necessary. *See, e.g., Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 487-88, 99 L. Ed. 563, 572 (1955) ("the law need not be in every respect logically consistent with its aims to be constitutional").

Turning to the trial court's second basis for concluding that the buffer-zone regulations violate due process—the regulations do not involve a determination of whether the deposit was intentional, purposeful, or willfully negligent—we again find the trial court's conclusion misplaced. Simply stated, due process does not require every regulatory provision to contain a state-of-mind element. *See, e.g., State v. Sumner*, 232 N.C. 386, 61 S.E.2d 84 (1950) (holding that a warrant was sufficient to support a conviction of operating a motor vehicle on a public highway at a speed of ninety miles an hour). For

example, we have held that proof of a speeding violation requires nothing more than a showing that the vehicle was traveling above the speed limit. *Id.* Similarly, we have held that statutory rape, as a strict-liability crime, requires nothing more than proof that the defendant committed the act, *see, e.g., State v. Murry,* 277 N.C. 197, 203, 176 S.E.2d 738, 742 (1970) ("[n]either force[] nor intent [is an] element[] of this offense"); the fact that the defendant failed to act purposefully, intentionally, or with willful negligence is of no consequence.

In the case *sub judice*, the Pesticide Board's decision not to include an intent element in rule 2 NCAC 9L .1005 is rationally related to its legitimate objective of protecting humans and the environment from the risks associated with pesticide application. Specifically, the risk and harm to humans and the environment are the same regardless of whether the pesticide was intentionally deposited in a buffer zone. The only effect an intent element would have upon the rule would be to place an undue burden on the rule's enforcement. Indeed, numerous cases would end up focusing upon the applicator's intent, a focus having no relationship to the regulation's overriding goal.

Accordingly, we conclude that the buffer-zone regulations set forth in rule 2 NCAC 9L .1005 are rationally related to the legislative goal of protecting people and the environment from the risks associated with pesticide use. Moreover, we conclude that the means taken to achieve this goal are reasonable. Therefore, the buffer-zone regulations do not violate due process.

## B. EQUAL PROTECTION

[11] The trial court determined that the buffer-zone regulations violate both the state and federal constitutional Equal Protection Clauses because they treat aerial pesticide applicators differently from ground pesticide applicators. In so ruling, the trial court held that there should be no difference in the restrictions placed upon these methods because the resulting harm is the same regardless of which method is used. We disagree.

Although statutes are void as denying equal protection whenever similarly situated persons are subject to different restrictions or are given different privileges under the same conditions, *see State v. McCleary,* 65 N.C. App. 174, 186, 308 S.E.2d 883, 891-92 (1983), *aff'd per curiam,* 311 N.C. 397, 317 S.E.2d 870 (1984), inequalities and classifications do not *per se* render a legislative enactment unconsti-

tutional, *see Cheek v. City of Charlotte*, 273 N.C. 293, 298, 160 S.E.2d 18, 23 (1968). Moreover, "[c]lassifications are not offensive to the Constitution 'when the classification is based on a reasonable distinction and the law is made to apply uniformly to all the members of the class affected.' " *Poor Richard's, Inc. v. Stone*, 322 N.C. 61, 67, 366 S.E.2d 697, 700-01 (1988) (quoting *Cheek*, 273 N.C. at 298, 160 S.E.2d at 23). Therefore, "[c]lassification is permitted when (1) it is based on differences between the business to be regulated and other businesses and (2) when these differences are rationally related to the purpose of the legislation." *Id.* at 67, 366 S.E.2d at 701.

In the case *sub judice*, we must determine whether aerial pesticide applicators, as a class regulated under rule 2 NCAC 9L .1005, are treated differently than the allegedly similarly situated class of ground pesticide applicators. Determinative of this issue is the fact that aerial applicators are indeed different from ground applicators.

First, aerial applicators are subject to different licensing requirements under N.C.G.S. § 143-452(d). Under that section, separate classifications or subclassifications are specified for ground and aerial methods of application including the requirement that aerial applicator contractors, as well as pilots, obtain a license. Moreover, rule 2 NCAC 9L .0505 distinguishes aerial and ground classifications as evidenced by comparing subsection (1), which applies to "pesticide applicators and public operators utilizing *ground* equipment," with subsection (2), which applies to "pesticide applicators and public operators utilizing *aerial* equipment." 2 NCAC 9L .0505(1), (2) (Nov. 1984) (emphasis added). Thus, the laws and regulations recognize a distinction between aerial and ground applicators and treat each accordingly.

Significantly, this distinction is necessary to congeal the regulations with the pesticide law's overriding goal of protecting people and the environment. Specifically, the distinction is needed because of the increased risk of drift and other sources of nontarget deposit associated with aerial application. *See* G.W. Ware *et al.*, *Pesticide Drift: Deposit Efficiency from Ground Sprays on Cotton*, 68 J. Econ. Entomology 549, 549-50 (1975). Indeed, Meads' own expert testified that an aerial applicator is ten times more likely to miss a targeted spraying zone than a ground applicator. Therefore, the increased risk of harm to people and the environment associated with aerial applications mandates treating aerial applicators in a distinct

manner. Accordingly, this distinction is rationally related to the pesticide regulations' underlying purpose and therefore is constitutionally permissible.

In summation, the different treatment accorded aerial and ground applicators is not arbitrary; rather, it is reasonable and rests upon the differences in licensing requirements and qualifications associated with each method of application. Moreover, the differences are rationally related to the increased likelihood of an off-target occurrence associated with aerial application. Accordingly, we conclude that the buffer-zone regulations in rule 2 NCAC 9L .1005 comply with both the state and federal constitutional Equal Protection Clauses.

## IV. CONCLUSION

We conclude that the Court of Appeals erred in holding that there was not substantial evidence to support the Pesticide Board's decision to assess a civil penalty and revoke Meads' license. We further conclude that the Pesticide Board did not commit any errors of law in reaching its decision. Lastly, we conclude that rule 2 NCAC 9L .1005 does not violate the constitutional rights of due process or equal protection.

Accordingly, we reverse the decision of the Court of Appeals and remand to that court for further remand to the Superior Court, Wake County, to issue an order affirming the decision of the North Carolina Pesticide Board.

REVERSED AND REMANDED.