**BRADLEY-REID CORP. v. N.C. DEP'T OF HEALTH & HUMAN SERVS.**

[201 N.C. App. 305 (2009)]

BRADLEY-REID CORPORATION, SANDRA BRADLEY-REID, Petitioner v. NORTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN SERVICES, DIVISION OF PUBLIC HEALTH, Respondent

No. COA08-1519

(Filed 8 December 2009)

**1. Administrative Law— judicial review of agency decision— decertification of HIV case management services**

The trial court did not err by reversing an administrative law judge's determination that petitioner corporation's decertification as a provider of HIV case management services by the North Carolina Department of Health and Human Services (DHHS) was unjustified. Substantial evidence supported the trial court's findings of fact that the violations found by DHHS at the corporation were systemic.

**2. Administrative Law— judicial review of agency decision—arbitrary and capricious standard—substantive due process**

The trial court's decision upholding a Department of Health and Human Services (DHHS) decertification of petitioner corporation as an HIV case management provider was not arbitrary or capricious. The evidence revealed that other HIV case management providers included in the record did not have problems similar to petitioner and petitioner had notice of the DHHS certification requirements. Further, petitioner was not denied substantive due process, and decertification would ensure that funds provided for public assistance would be protected.

Appeal by petitioner from order entered 1 August 2008 by Judge Beverly T. Beal in Superior Court, Mecklenburg County. Heard in the Court of Appeals 18 August 2009.

*Pamela A. Hunter, for petitioner-appellants.*

*Attorney General Roy A. Cooper, III, by Special Deputy Attorney General Mabel Y. Bullock, for respondent-appellee.*

STROUD, Judge.

Bradley-Reid Corporation ("Bradley-Reid") appeals a trial court order reversing an administrative law judge's determination that it's decertification as a provider of HIV case management services

BRADLEY-REID CORP. v. N.C. DEP'T OF HEALTH & HUMAN SERVS.

[201 N.C. App. 305 (2009)]

by the AIDS Care Unit at the North Carolina Department of Health and Human Services, Division of Public Health ("DHHS") was unjustified. Because substantial evidence supports the trial court's findings of fact that the violations found at Bradley-Reid by DHHS were systemic, and the agency's decision was not arbitrary or capricious, we affirm.

## I. Background

In December 2003, Bradley-Reid was certified as a provider of HIV Case Management Services by DHHS. Pursuant to N.C. Gen. Stat. § 108A-25(b)[1], DHHS promulgated 10A North Carolina Administrative Code 220.0124 (2005), which lists the components that are required for "HIV CASE MANAGEMENT." Each provider is certified initially for three years. At the end of the third year, DHHS' AIDS Care Unit conducts a "Quality Assurance" site visit to ensure that providers are adhering to those component requirements in 10A N.C. Admin. Code 220.0124 by reviewing agency policies, supervision logs provided for case managers, client satisfaction surveys, and client records.

On 20 September 2006, a Quality Assurance visit was conducted to review Bradley-Reid's HIV Case Management Service program. By Decertification Letter dated 3 November 2006, DHHS notified Bradley-Reid of its "intent to decertify Bradley-Reid Corporation as a provider of HIV Case Management services in Cabarrus, Gaston, Mecklenburg, Anson, Iredell and Union counties effective thirty (30) days from the date of this letter." (emphasis omitted). The Decertification Letter stated that the intent to decertify Bradley-Reid was based on "findings from the Quality Assurance review completed on September 20, 2006."

On or about 30 November 2006, Bradley-Reid filed a Petition for a Contested Case and Supplemental Petition for a Contested Case. On 9 May 2007, an administrative hearing was held before Administrative Law Judge Sammie Chess, Jr. ("ALJ"). On 20 August 2007, the ALJ reversed Bradley-Reid's decertification. DHHS' Final Agency Decision did not adopt the ALJ's reversal but upheld DHHS' decertification of Bradley-Reid. Bradley-Reid filed a Petition for Judicial Review and Request for Stay in Superior Court, Mecklenburg County on or about 28 November 2007.

---

1. N.C. Gen. Stat. § 108A-25(b) (2007) states, "The program of medical assistance is established as a program of public assistance and shall be administered by the county departments of social services under rules adopted by the Department of Health and Human Services."

The matter was heard on 21 April 2008 by the Honorable Beverly T. Beal, in Superior Court, Mecklenburg County and by Order dated 1 August 2008, Judge Beal affirmed DHHS' decertification of Bradley-Reid. As required by N.C. Gen. Stat. § 150B-51(c) (2007), the trial court made findings of fact and conclusions of law. The trial court ordered that "the decision of [DHHS] in decertifying [Bradley-Reid] as an HIV case management agency, is adopted, and is upheld." On 28 August 2008, Bradley-Reid gave notice of appeal.

## II. Substantial Evidence of Violations

[1] Bradley-Reid contends that there is "no substantial evidence presented by [DHHS] to prove that the violations of [Bradley-Reid] were systemic and therefore [Bradley-Reid] . . . deserve[d] the opportunity to make corrective actions to said alleged violations prior to decertification."

When this Court reviews an agency decision "[t]he scope of review to be applied . . . is the same as it is for other civil cases. In cases reviewed under G.S. 150B-51(c), the court's findings of fact shall be upheld if supported by substantial evidence." N.C. Gen. Stat. § 150B-52 (2007). Further, "[w]hen this Court reviews appeals from superior court either affirming or reversing the decision of an administrative agency, our scope of review is twofold . . . : (1) whether the superior court applied the appropriate standard of review and, if so, (2) whether the superior court properly applied this standard." *Corbett v. N.C. DMV*, 190 N.C. App. 113, 118, 660 S.E.2d 233, 237 (2008) (citation and quotation marks omitted).

N.C. Gen. Stat. § 150B-51(c) (2007) gives the standard of review for a trial court from a final decision by an administrative law judge in a contested case in which the agency *does not* adopt the administrative law judge's decision:

the court shall review the official record, de novo, and shall make findings of fact and conclusions of law. In reviewing the case, the court shall not give deference to any prior decision made in the case and shall not be bound by the findings of fact or the conclusions of law contained in the agency's final decision. The court shall determine whether the petitioner is entitled to the relief sought in the petition, based upon its review of the official record. The court reviewing a final decision under this subsection may adopt the administrative law judge's decision; may adopt, reverse, or modify the agency's decision; may remand the case to

the agency for further explanations under G.S. 150B-36(b1), 150B-36(b2), or 150B-36(b3), or reverse or modify the final decision for the agency's failure to provide the explanations; and may take any other action allowed by law.

N.C. Gen. Stat. § 150B-51(c).

The case *sub judice* is a contested case in which DHHS did not adopt the administrative law judge's decision and therefore the requirements of N.C. Gen. Stat. § 150B-51(c) apply. The trial court made findings of fact and conclusions of law and stated that it reviewed the official record *de novo* pursuant to the requirements of G.S. 150B-51(c). We next determine whether the trial court properly applied the *de novo* standard of review when it affirmed the agency's decision. *Corbet*, 190 N.C. App. at 118, 660 S.E.2d at 237.

Pursuant to N.C. Gen. Stat. § 150B-52 (2007), we are to consider whether the findings of fact are supported by "substantial evidence," defined as "relevant evidence as a reasonable mind might accept as adequate to support a conclusion, even if contradictory evidence may exist." *Cape Med. Transp., Inc. v. N.C. Dep't of Health & Human Servs.*, 162 N.C. App. 14, 22, 590 S.E.2d 8, 14 (2004) (citation and quotation marks omitted).

The trial court's findings three, four, and five relate to Bradley-Reid's first contention. The trial court found:

3. Certain records are required to be kept by an agency. To provide an audit trail, a provider must keep the following documents for a minimum of five years from the date of service: Assessments and service plans, documentation of the case managers HIV case management activities including description of HIV case management activities, dates of service, amount of time involved in HIV case management activities in minutes, records of referrals to providers and programs, records of service monitoring and evaluations and claims for reimbursement. Progress notes are required to be kept on each person provided services by an agency. There is no required form for the progress notes, but they must contain certain basic information and be kept in the individual file of the client. Basic information includes the name of the client, the date of services, the billable units (BU's), a statement of the services provided at that time, and signing by the case manager. An agency is required to have an internal quality assurance policy and it is requested that an agency use a chart review tool.

Substantial evidence shows that HIV case management service providers are required to keep certain documentation to provide an audit trail for DHHS and permit access to and examination of that documentation by DHHSs AIDS Care Unit. Providers are required to sign a Medicaid Participation Agreement which states they must "Comply with the federal and state laws, regulations, state reimbursement plan and polices governing the services authorized under the Medicaid Program[,]" maintain certain records and those records are subject to audit or review by Federal and State representatives at any time during hours of operation. Also, "billings and reports related to services to Medicaid patients and the cost of that care must be submitted in the format and frequency specified by [the Division of Medical Assistance] and/or its fiscal agent . . . ." Further, 10A North Carolina Administrative Code 220.0124(a)(3) requires that "[i]n order to be reimbursed by the Division of Medical Assistance, a provider shall provide . . . (3) Development and implementation of a plan of care which includes goals, services to be provided and *progress notes*[.]" (emphasis added) There is no set format or form for progress notes but they must contain the required information. Progress notes must contain time spent on an activity; the month, day and year of contact; and "should be written and signed by the case manager completing the contact or activity." Progress note documentation should "substantiate the number of units billed for service delivery." Case managers are required to sign and date each entry for handwritten progress notes and progress notes on a computer must be printed and signed. Each provider is required to keep an internal quality assurance policy and develop a chart review tool. As the above substantial evidence supports the trial court's findings regarding DHHS' requirements for HIV Case Management Services, this assignment of error is overruled.

Next, the trial court found:

4. On September 20, 2006 a team from HIV Case Management conducted a QA visit to Petitioner's business. Petitioner had been notified of the intended visit in advance. Marsha Beth Karr and Robert Winstead were members of that team. They are Respondent's employees. Previously Mr. Winstead had . . . conducted two TA visits to Petitioner. At those visits inconsistencies were found, but they were not severe enough to warrant decertification. At the QA visit 16 or 17 client files (or charts) were examined. Respondent has a client base of 60. Some of the files had been pre-selected by Petitioner's employees. Additional files

were reviewed at random. All four of the case managers of Petitioner were failing to write progress notes, not completing reassessments, and not completing care plans. At that time those files were found to contain records intended to be progress notes, in the form of sticky notes or pieces of paper. Some notes did not contain the date of activity, or did not contain client identifying information, or did not contain the billable amount of time spent on the service. Some progress notes were not in chronological order and not signed by the case manager. In one file, missing progress notes existed, but not in the proper file. They were later found by Petitioner's employee in another client's chart. That error was not corrected on the day of the QA visit, and a request to correct the error was not made later. Care plans were not up to date and signed. Copies of internal QA reviews were requested, but they were not produced. In three Charts, where annual reassessments of clients were done, the Petitioner had clients sign blank paperwork including care plans. Ms. Ellen Reid handed Mr. Winstead a couple of charts and said, "Now I don't have all the paperwork up-to-date in these. I've been busy. I haven't had time to get it done" (Transcript page 103). Medicaid had been billed for activity, but the QA visit team could not match up those billing profiles with documentation in the charts. Petitioner's employees had attended training provided by contractor Duke University and the AIDs Care Unit HIV Case Management Program.

We find that substantial evidence supports the trial court's finding regarding violations DHHS discovered at the 20 September 2006 Quality Assurance visit to Bradley-Reid. Robert Winstead ("Mr. Winstead"), a public health program consultant with the AIDS Care Unit at DHHS, testified that in September of 2006, he and Beth Karr ("Ms. Karr"), supervisor of the HIV Case Management Program for the AIDS Care Unit at DHHS, conducted a Quality Assurance site visit at Bradley-Reid. They reviewed files or charts pre-selected by Bradley-Reid and additional charts pulled by Mr. Winstead and Ms. Karr. At the time of the Quality Assurance site visit, Bradley-Reid had approximately sixty clients and sixteen or seventeen charts were reviewed. When Mr. Winstead and Ms. Karr pulled the random charts, they noticed that Bradley-Reid's four case managers were not consistently writing progress notes and completing reassessments and care plans. Mr. Winstead stated that "in numerous charts they didn't have progress notes, . . . they had these slips of paper that didn't contain the correct information to constitute a progress note." Additionally,

progress notes were not signed or in chronological order and did not include a column with the units of service listed. Mr. Winstead testified that "[Bradley-Reid] had billed Medicaid based on our Medicaid billing profile for activity, but [Mr. Winstead and Ms. Karr] could not match up those billing profiles with documentation they had because . . . the Post-it notes and the scratch pieces of paper didn't have client identifying information on [them].". Therefore, they could not tell if a note in the chart really belonged to that client or not. Sandra Reid, a supervisor and case manager at Bradley-Reid, testified that records were put in the wrong client's file, and she did not correct this error the day of the Quality Assurance visit or make a request to DHHS for a correction. Bradley-Reid could not produce copies of their Quality Assurance reviews. Mr. Winstead also observed that "in charts where annual reassessments were done, [Bradley-Reid] had gone out and gotten clients to sign blank paperwork" making him question the quality of care Bradley-Reid's clients actually received. Mr. Winstead testified that when he and Ms. Karr started pulling random charts, Ellen Reid, another supervisor and case manager at Bradley-Reid, handed Mr. Winstead "a couple of charts and said, 'Now I don't have all the paperwork up-to-date in these. I've been busy. I haven't had time to get it done.' " Bradley Reid's case managers attended HIV Case Management service provider training titled "Advanced Case Management Resource Day; Best Practices in HIV Case Management: Progress Notes and Ethics" on 22 July 2005 contracted by Duke University and the HIV Case Management Program. As the above substantial evidence supports the trial court's findings regarding the various violations DHHS found at the 20 September 2006 Quality Assurance visit to Bradley-Reid, this assignment of error is overruled.

Next, the trial court found:

5. Other QA visits to other certified agencies have been conducted by the HIV Case Management Program, and Ms. Karr and Mr. Winstead as employees thereof. Various actions have been taken by the Respondent in those cases, in response to deficiencies found. Some agencies are allowed an opportunity to correct problems found, and not decertified. Some agencies were not allowed corrective action and were decertified as a result of QA visits. One key consideration at a QA visit is determination of whether a problem, such as maintaining proper progress notes, is systemic for the agency, involving performance by multiple case managers.

BRADLEY-REID CORP. v. N.C. DEP'T OF HEALTH & HUMAN SERVS.

[201 N.C. App. 305 (2009)]

There is substantial evidence in the record supporting the trial court's finding regarding how DHHS has dealt with deficiencies in case management programs as well as its finding that the violations of Bradley Reid were systemic. Mr. Winstead testified in regard to the determination of whether or not corrective action is allowed stating:

> [W]e look at first is, when we're looking at the work that's being produced by case managers in an agency, we look to see if there's problems, is it a problem that one case manager has, is it a problem that all the case managers have, meaning that it's more systemic and that everybody's doing something wrong, doing the same thing wrong. We also look at whether or not billing has occurred when progress notes did not exist. What we will often see or sometimes see is that agencies have not written progress notes, but they didn't bill for [Medicaid reimbursement] what they say they've provided . . . . And if they didn't bill Medicaid for reimbursement, then we don't really know how we can do anything because there's nothing to recoup. There's no referral to make to Program Integrity in terms of a recoupment—potential recoupment because they didn't bill for the service.

Mr. Winstead stated the following reasons that corrective action was not allowed for Bradley-Reid:

> Because when we looked at the charts—when we pulled the random charts, what we saw was that each—we pulled work from each of the four case managers, and what we saw was that all four of the case managers were not writing progress notes, were not completing reassessments, were not completing care plans. So it appeared to us that it was a systemic problem that all the case managers were participating in . . . . [T]hey had billed Medicaid based on our Medicaid billing profile for activity, and we could not match up those billing profiles with documentation they had because, as I said earlier, the Post-it notes and the scratch pieces of paper didn't have client identifying information on it. So I couldn't tell if a note in this chart really belonged to that person or not.

As substantial evidence shows that none of the four case managers at Bradley-Reid were consistently preparing proper progress notes and keeping other required records, so that Mr. Winstead and Ms. Karr could not match up with the required documentation for

BRADLEY-REID CORP. v. N.C. DEP'T OF HEALTH & HUMAN SERVS.

[201 N.C. App. 305 (2009)]

Medicaid billing, the trial court properly found that the problems with Bradley-Reid were systemic and DHHS was justified in not allowing corrective action. Accordingly, this assignment of error is also overruled.

### III. Arbitrary and Capricious

[2] Bradley-Reid next contends that DHHS' actions in decertifying it as an HIV case management provider were arbitrary and capricious, and the trial court erred as a matter of law in affirming DHHS' decision. Both Bradley-Reid and DHHS argue that a "whole record test" should be applied, which involves examining "all of the competent evidence, including that which contradicts the agency's conclusion." However, DHHS argues that the trial court "is not permitted to override decisions within agency discretion when that discretion is exercised in good faith and in accordance with law." In contrast, N.C. Gen. Stat. § 150B-51(c) requires a *de novo* review:

> the court shall review the official record, de novo, and shall make findings of fact and conclusions of law. *In reviewing the case, the [trial] court shall not give deference to any prior decision made in the case and shall not be bound by the findings of fact or the conclusions of law contained in the agency's final decision[.]*

N.C. Gen. Stat. § 150B-51(c) (emphasis added). In *Cape Med. Transp., Inc. v. N.C. Dep't of Health and Human Services,* 162 N.C. App. 14, 23, 590 S.E.2d 8, 14 (2004), this Court, addressed whether an agency decision was arbitrary and capricious in the context of a trial court's G.S. § 150B-51(c) review. The Court stated that it was the "legislative intent behind section 150B-51(c) [] to increase the judicial scope of review in cases which an agency rejects [an administrative law judge's] decision" and rejected a "whole record" test as applicable to G.S. § 150B-51(c). *Cape Med. Transp.,* 162 N.C. App. at 21-22, 590 S.E.2d at 13-14. The Court went on to apply the G.S. § 150B-51(c) standard of review, stating that "[a]n agency's decision is arbitrary and capricious if it lacks 'fair and careful consideration . . . [or] fail[s] to indicate 'any course of reasoning and exercise of judgment.' " *Id.* at 22-23, 590 S.E.2d at 14. As stated above we have determined that the trial court properly applied the standard from N.C. Gen. Stat. § 150B-51(c). *Corbett,* 190 N.C. App. at 118, 660 S.E.2d at 237. We next determine whether the superior court properly applied the *de novo* standard, in addressing Bradley-Reid's remaining contentions that DHHS' actions were arbitrary and capricious. *Id.*

A. Other HIV Case Management Service Providers

Specifically, Bradley-Reid contends that DHHS' decertification was arbitrary and capricious because other providers with deficiencies more egregious than those cited at Bradley-Reid had been allowed to submit corrective action plans and were not decertified, but Bradley-Reid was not allowed the opportunity to take any corrective action prior to being decertified by DHHS.

The trial court made finding of fact number five regarding DHHS' review of other HIV case management providers:

> Some agencies are allowed an opportunity to correct problems found, and not decertified. Some agencies were not allowed corrective action and were decertified as a result of QA visits. One key consideration at a QA visit is determination of whether a problem, such as maintaining proper progress notes, is systemic for the agency, involving performance by multiple case managers.

Mr. Winstead testified in regard to the determination of whether or not corrective action is allowed:

> [W]e look at first is, when we're looking at the work that's being produced by case managers in an agency, we look to see if there's problems, is it a problem that one case manager has, is it a problem that all the case managers have, meaning that it's more systemic and that everybody's doing something wrong, doing the same thing wrong. We also look at whether or not billing has occurred when progress notes did not exist. What we will often see or sometimes see is that agencies have not written progress notes, but they didn't bill for [Medicaid reimbursement] what they say they've provided . . . . And if they didn't bill Medicaid for reimbursement, then we don't really know how we can do anything because there's nothing to recoup. There's no referral to make to Program Integrity in terms of a recoupment—potential recoupment because they didn't bill for the service.

As stated above, the trial court's findings of fact and substantial evidence in the record show that all four case managers at Bradley-Reid were not correctly filling out progress notes and billing for services and that Mr. Winstead and Ms. Karr could not match up the required documentation.

Substantial evidence in the record shows that other HIV case management providers referred to by Bradley-Reid at the hearing

were allowed corrective action because decertification was not warranted. DHHS allowed Mecklenburg County Health Department and HIV case management provider to take corrective action. As defendant points out, the DHHS Quality Assurance review team discovered that some Mecklenburg County Health Department charts did not contain progress notes. However, unlike Bradley-Reid, this incident only involved one case manager and "they had not billed for the charts in question."

Mr. Winstead and Ms. Karr also testified regarding a Quality Assurance visit to Living Water CDC, another HIV case management service provider that DHHS allowed corrective action. Mr. Winstead stated that the agency director was converting all of their records for electronic storage, including the progress notes. Due to a malfunctioning printer, the supervisor was unable to print the progress notes. However, the supervisor was able to show Mr. Winstead on the computer screen progress notes for the charts they were reviewing. Mr. Winstead made a subsequent visit and saw the printed and signed progress notes.

Quality Assurance visit reports from other HIV case management service providers, Metrolina AIDS Project and Western North Carolina Community Health Services, included in the record, document some errors in a few progress notes and billing procedures but unlike Bradley-Reid, those problems did not extend to all of their case managers.

As there was substantial evidence supporting the trial court's findings regarding other HIV case management providers allowed to make corrections, the assignment of error regarding this finding of fact is overruled. N.C. Gen. Stat. § 150B-52. This evidence shows that unlike Bradley-Reid, other HIV case management providers included in the record that were allowed corrective action did not have problems with all of their case managers correctly filling out progress notes and billing for services that did not match up to their documentation. Therefore, DHHS' actions in decertification of Bradley-Reid and not allowing corrective action were not arbitrary or capricious.

B. Notice of DHHS Requirements

Bradley-Reid also argues that DHHS' decision was arbitrary and capricious because Bradley-Reid and others similarly situated have "no idea of what problems or circumstances would cause them to be decertified" and DHHS failed to give "any policy or procedure

which required [Bradley-Reid] to maintain Progress Notes in a specific manner."

The trial court made findings of fact two and three[2] regarding training and the requirements of progress notes for HIV case management providers. Finding of fact two states in pertinent part:

> 2. Certified agencies are provided with training . . . and an HIV Case Management Provider Manual . . . . The HIV Case Management Program conducts quality assurance site visits (QA visits) to agencies. Technical Assistance visits (TA visits) are also conducted by the HIV Case management Program. The purpose of a TA visit is to review a new agency's work to give them some feedback as to what they may not be doing correctly. A newly certified agency is entitled to four TA visits within the first year of certification.

Substantial evidence in the record shows that a *HIV Case Management Provider Manual* (April 1994) is provided to an applicant when it submits an application to become a HIV case management provider. This manual is used by DHHS to inform HIV case management providers of the "HIV CASE MANAGEMENT" requirements of 10A N.C. Admin. Code 220.0124. 10A N.C. Admin. Code 220.0124 states, among other requirements, that "In order to be reimbursed by the Division of Medical Assistance, a provider shall provide all of these components: . . . . (3) Development and implementation of a plan of care which includes goals, services to be provided and *progress notes*[.]" (emphasis added). The *HIV Case Management Provider Manual* (April 1994) restates this requirement for progress notes in "Section II: HIV CASE MANAGEMENT SERVICES PROGRAM GUIDELINES" in the "HIV Case Management" chapter under "Core Components." The same requirement for progress notes is also repeated in the "Assessment" chapter in the manual, stating that "The client record should include a care plan . . . dated and signed by the case manager and the client, which includes . . . . Signed and dated *progress notes*. . . ." (emphasis added).

In addition, DHHS' AIDS Care Unit provides training for HIV case management providers and staff, including training as to preparation of progress notes. At that training, HIV case management staff learn about the details required in progress notes and that progress notes are to be signed. During training, HIV case management providers and staff are given a copy of the training materials. Case

---

2. The trial court's finding of fact number three is quoted in Part II supra.

managers from Bradley-Reid attended one of these training sessions on 22 July 2005, titled "Advanced Case Management Resource Day; Best Practices in HIV Case Management: Progress Notes and Ethics." Training materials provided that day to the HIV case management providers in attendance state that a "case manager must sign each entry for hand written Progress Notes." Additionally, those materials note that progress notes must contain time spent on the activity; the month, day and year of contact; "should reflect appropriate billing"; and "should substantiate the number of units billed for service delivery."

Ms. Karr testified that the AIDS Care Unit consultants send a memorandum to all certified HIV case management providers describing their findings after completing Quality Assurance reviews for that year. The purpose of the memo is to inform all HIV case management providers of the types of non-compliance issues discovered during Quality Assurance reviews so HIV case management providers would be aware of those findings and could take appropriate steps to comply with requirements before a Quality Assurance visit. Included in this memorandum was the information regarding progress notes, including requirements that electronic progress notes must be printed and signed and each handwritten entry must be signed.

Bradley-Reid's own "HIV Case Management Review" form requires that progress notes be signed, in chronological order, legible and neat. Sandra Reid testified that she was familiar with the requirements that progress notes have the description of the activity, the time, the date and a signature, and she attended the training in July 2005 that was specifically on progress notes. Bradley-Reid's 2003 certification letter stated that "[f]or specific questions regarding the implementation of your case management program, please call the district case management consultant for your area." Mr. Winstead testified that he had conducted two technical assistance visits with Bradley-Reid and during these visits found some inconsistencies in their progress notes not severe enough to warrant decertification. However, Bradley-Reid did not contact Mr. Winstead or Ms. Karr to ask any questions concerning the required progress notes.

Substantial evidence shows that Bradley Reid and other similarly situated HIV case management providers had notice as to DHHS' requirements to remain certified, supporting the trial court's findings. N.C. Gen. Stat. § 150B-52. Therefore, we cannot say that DHHS did not give "fair and careful consideration" or that DHHS's decision "fail[ed] to indicate 'any course of reasoning and exercise of judg-

ment.' " *Cape Med. Transp.*, 162 N.C. App. at 23, 590 S.E.2d at 14. Bradley-Reid's argument is overruled.

C. Substantive Due Process

Bradley-Reid also argues DHHS "acted in an arbitrary and capricious manner in administering the rules and laws applicable to the case management service program[,]" thus amounting to a violation of Bradley-Reid's substantive due process rights.

"Substantive due process denotes a standard of reasonableness and limits a state's exercise of its police power . . . . *Beneficial N.C. v. State ex rel. North Carolina State Banking Comm'n*, 126 N.C. App. 117, 127, 484 S.E.2d 808, 814 (1997).

> Under North Carolina jurisprudence, state 'due process' is governed by Section 19 of the Constitution of North Carolina, which provides that '[n]o person shall be deprived of his life, liberty, or property, but by the law of the land.' N.C. Const. art. I, § 19. Although this Court often considers the 'law of the land' synonymous with 'due process of law,' see *A-S-P Assocs. v. City of Raleigh*, 298 N.C. 207, 258 S.E.2d 444 (1979), we have reserved the right to grant Section 19 relief against unreasonable and arbitrary state statutes in circumstances where relief might not be obtainable under the Fourteenth Amendment to the United States Constitution, see *Lowe v. Tarble*, 313 N.C. 460, 329 S.E.2d 648 (1985).

*Meads v. North Carolina Dep't of Agric., Food & Drug Protection Div., Pesticide Sec.*, 349 N.C. 656, 671, 509 S.E.2d 165, 175 (1998). "The traditional substantive due process test has been that a statute must have a rational relation to a valid state objective." *Beneficial N.C.*, 126 N.C. App. at 127, 484 S.E.2d at 814 (citation and quotation marks omitted).

However, Bradley-Reid does not challenge the validity of any statute or rules. Rather, it contends the traditional substantive due process test should be applied to invalidate the trial court's adjudicatory decision upholding Bradley-Reid's decertification. We conclude that the trial court's decision did not violate Bradley-Reid's substantive due process rights.

N.C. Gen. Stat. § 108A-25(b) states that the goal of a program of medical assistance, such as the HIV case management services, is to provide "a program of public assistance . . . under rules adopted by the Department of Health and Human Services." The trial court's

decision is rationally related to the N.C. Gen. Stat. § 108A-25(b) goal of providing "a program of public assistance[,]" as supported by the trial court's findings of fact, conclusions of law and substantial record evidence.

The trial court's finding of fact number two states "Services provided by a certified agency are reimbursed by federal funds from the Division of Medical Assistance." The trial court's decision shows that it perceived that Bradley-Reid's lack of proper progress notes prevented DHHS from being able to accurately account for funds allotted by the Division of Medical Services for this program of public assistance. Given that this problem was evident in all four case managers at Bradley-Reid, decertification would ensure that funds provided for public assistance would be protected. Accordingly, we find no substantive due process right violated in the trial court's decision to affirm DHHS' decertification of Bradley-Reid.

IV. Conclusion

As substantial evidence supports the trial court's findings that the violations found at Bradley-Reid by DHHS were systemic and substantial evidence supports that the agency's decision was not arbitrary or capacious, we affirm the trial court's order reversing the administrative law judge's decision and affirming decertification of Bradley-Reid.

Affirm.

Judges WYNN and BEASLEY concur.